Argued at Pendleton May 5, affirmed June 4, rehearing denied July 22, 1919.

# FULLER *v.* OREGON–WASH. R. & N. CO.*

(181 Pac. 338, 991.)

**Appeal and Error—Review—Verdict.**

1. Under Article VII, Section 3, of the Constitution, as amended, which declares that no fact tried by a jury shall be re-examined by any court unless the court can affirmatively say there is no evidence to support the verdict, the Supreme Court cannot consider the weight of the evidence, when there is any substantial testimony to support the verdict.

**Negligence—Comparative Negligence — Injuries to Servants—Federal Employers' Liability Act.**

2. Under the Federal Employers' Liability Act (U. S. Comp. Stats., §§ 8657–8665), contributory negligence goes only to the question of damages, and is not a defense.

**Master and Servant—Rules—"Under Control."**

3. Where rules of a railroad company required a train entering a block occupied by another train to proceed under control at a speed not exceeding six miles an hour, the words "under control" mean ability to stop within the distance the track is seen to be clear.

**Evidence—Judicial Notice.**

4. The courts will take judicial notice of the natural conditions of visibility early in the morning, as shown by the almanac.

**Master and Servant—Injuries to Servant—Evidence—Sufficiency.**

5. In action for death of a rear-end trainman, killed in a collision, evidence *held* sufficient to carry to jury question of negligence of railroad company.

**Master and Servant—Injuries to Servant—Evidence—Sufficiency.**

6. In an action for death of a rear-end trainman, killed in a collision, evidence *held* insufficient to show that his negligence was the sole cause of his death.

**Master and Servant—Injuries to Servant—Assumption of Risk.**

7. While the defense of assumption of risk is available under the Federal Employers' Liability Act (U. S. Comp. Stats., §§ 8657–8665), it does not apply to extraordinary hazards created by the negligence of a fellow-servant.

**Master and Servant—Injuries to Servant—Instruction—Presumptions.**

8. In an action for the death of a rear-end brakeman, killed in a collision, an instruction that the burden of proving contributory negli-

---

*On constitutionality, application and effect of the Federal Employers' Liability Act, generally, see comprehensive notes covering many phases of the question in 47 **L. R. A. (N. S.)** 38; **L. R. A.** 1915C, 47.        REPORTER.

gence was on the railroad company, and that there was a presumption that he exercised reasonable care, *held* correct.

**Appeal and Error—Review—Harmless Error.**

9. In an action for the death of a rear-end brakeman, killed in a collision, where the pleadings admitted and the evidence showed that he was in the caboose at the time of the collision, questions as to his whereabouts a moment or two before *held* in no wise prejudicial.

**Master and Servant—Injuries to Servant—Jury Question.**

10. In an action under Federal Employers' Liability Act (U. S. Comp. Stats., §§ 8657–8665), for death of a rear-end brakeman, killed in a collision with a following train, an instruction submitting to the jury the question whether the company was negligent in operating the following engine backward without a headlight, required by rules of the Interstate Commerce Commission, *held* proper.

## ON PETITION FOR REHEARING.

**Appeal and Error—Review—Evidence—Conclusiveness.**

11. Evidence in support of the verdict will be deemed conclusive on appeal.

**Master and Servant—Injuries to Servant—Question for Jury.**

12. In an action for the death of railroad employee killed in a collision, the question whether the tail lights on the caboose in which he was riding were burning, *held* under the evidence for the jury.

From Union: JOHN W. KNOWLES, Judge.

In Banc.

This is an action brought under the Federal Employers' Liability Act (Act April 22, 1908, c. 149, 35 Stat. 65, U. S. Comp. Stats., §§ 8657–8665), to recover damages for the death of plaintiff's intestate, Walter Francis Fuller, which was caused by a rear end collision between two of defendant's trains at North Fork, Oregon.

Deceased, at the time of the accident, and for more than five years previous thereto, had been rear brakeman and flagman on defendant's freight trains, operating in and out of La Grande, Oregon, and on the morning of the accident was acting as such on train No. 255, which left La Grande westbound at 5:45 on the evening of September 2, 1917. At Meacham station the train took on five or six carloads of sheep, the whole load

from there comprising 70 cars, including the caboose. At 2:55 A. M. on September 3d, this train pulled out from Meacham bound west. While at Meacham, train 2140 arrived there, having backed down from Kamela, a station a few miles beyond Meacham, where it had acted as a helper engine, pulling a freight train from Reith, a station next west from North Fork to Kamela, which is the station situated upon the summit of the Blue Mountains. Train 2140 was merely a locomotive engine and its tank.

Defendant claims that the track leading to the turntable at Kamela was blocked by other trains so it was necessary for 2140 to back down beyond North Fork, instead of turning, as is usual in such cases. Train 2140 had an electric headlight on the front of its engine, which would be at the east end while she was backing. At the rear end of the tank which, as the locomotive was backing, would be the front or west end of the train, there were placed the usual marker lights, one at each corner, and a white light in the center, but those lanterns would not throw sufficient light ahead to enable the conductor and engineer on the locomotive to perceive objects on the track, if the morning were otherwise dark. Except as signals to trains proceeding east, they were of no value.

Before train 255 left Meacham, McClure, the conductor, asked the conductor on 2140 to close the switch after his train, which was done. About a mile west of Meacham train 255 broke in two, and deceased went back to flag any train that might be following, and as the accident was soon remedied 255 went on without him. A few minutes later 2140 came along and was flagged by deceased, who was taken on board and carried to Huron, a station about 7 miles west of Meacham, where they overtook 255, and deceased

boarded his own train and proceeded with it to North Fork. Near Camp station, about 4 miles west of Huron, 255 broke in two again and was delayed about five minutes, when it was coupled up and proceeded to North Fork, which is about 2 miles west of Camp.

Plaintiff's evidence indicated that the tail lights and indicator on 255 were burning at Camp station, and there was a considerable down grade from there to North Fork. Train 255 had orders to side-track at North Fork for passenger train No. 4, bound east, which was due at that station at 4:07 A. M. What the running orders of 2140 were, is not disclosed, but the conductor, Guy E. Chapin, testified that at Huron deceased showed him the orders directing 255 to side-track at North Fork for No. 4; that at that time it was agreed between himself and deceased that deceased should flag 2140 into North Fork, and that 2140 should close the switch so as not to delay 255 when it left. According to the rules, 255 should have been in the clear upon the passing track at North Fork at 4:02 A. M. The evidence indicates that it arrived near the east end of the side-track about 3:56 A. M., made the usual service stop to enable the head brakeman to throw the switch for the side-track, which probably consumed not to exceed four or five minutes, and then started up, but had gone less than a car-length when it broke in two again. The effect of breaking in two is to exhaust the air and set the brakes at emergency, causing a sudden stoppage of the train, and more or less of a bumping of the cars, as the slack is taken up. It is difficult to estimate the difference in effect, as to the bumping of the cars from an emergency stop and an ordinary service stop. The conductor testified in this instance:

"It was a little out of the way for making an ordinary stop for a switch or anything. * * It would be a broken,—a break-in-to feature—where the air would be applied at once."

Mr. Hoskins, who was the only witness called in relation to the accident who was not at the time in the employ of the defendant, testified:

That the stoppage resulted in a sudden bump so that "we kind of tipped forward, and it gave a couple of bumps so the air was set quickly. It was so we knew it had broke. * * It was unusual or different from a stop. It was unusual enough so that you would know something had happened to the car, that is: it broke."

The witness testified in substance, that when the break occurred, he heard an engine coming down in the rear of the train; that the sound was so distinct that he knew it was within the block, and that the crash from the collision came immediately after. Upon cross-examination the witness said:

"It was not an almighty bump * * while a little bit more abrupt than just the stopping of a train. It was a sudden stop. We were not going very fast at the time. There was quite a jerk to it."

Witness further testified in substance that it was not over two minutes after the break occurred until the collision.

The testimony indicated that there was a bridge across the stream immediately east of North Fork station; that the bridge was 128 feet long; that the rear end of 255 was about two or three feet west of the west end of the bridge, and that the track approaches the bridge upon a curve, but that the curve was not sufficient to have prevented the rear end of 255 from being observed at a distance of 200 feet east of the bridge, if the other conditions as to light had been

favorable, or the tail lights had been burning upon the rear of the caboose. The evidence indicated that they were burning at Camp station, two miles east.

The engineer of 2140 testified that he saw no lights as he approached the bridge. There was a down-grade from the east of about 1.37 to and across the bridge. The evidence was conflicting as to the physical light conditions. The witness, Hoskins, testified that day was just breaking and that objects, such as a car or a man, could be seen two or three hundred feet away.

Chapin, the conductor of 2140, testified that it was very dark and smoky from forest fires, so he was unable to see anything ahead by natural light; that if the tail lights of 255 had been burning, he would have been able to have seen them in time to have avoided the collision. We take judicial notice of the astronomical fact that the morning twilight began at 3:44 A. M., and that the moon was about three hours high at the time of the accident.

The following rules of the company were introduced in evidence:

"When a train stops or is delayed under circumstances in which it may be overtaken by another train, the flagman must go back immediately with stop signals a sufficient distance to insure full protection. One-fourth of a mile from the rear of the train he will place one torpedo on the rail, continuing back one-half mile from the rear of his train, he will place two torpedoes on the rail, two rail-lengths apart. He may then return to the single torpedo where he must remain until relieved by another flagman or is recalled by the whistle of his engine. When recalled, if he does not see or hear an approaching train, the single torpedo will be removed (and not before), if conditions warrant, a red fusee will be displayed to protect his train while returning.

"During foggy or stormy weather, in the vicinity of obscure curves or descending grades, or if the other conditions require it, the flagman will increase the distance.

"Should a train be seen or heard approaching before flagman has reached the required distance, he must, at once place one torpedo on the rail, and, if by night or during foggy or stormy weather, display a red fusee, continuing in the direction of the approaching train.

"If the flagman is recalled before reaching the required distance he will, if necessary, place two torpedoes on the rail two rail-lengths apart by day, and by night display a red fusee in addition, to protect his train while returning.

"Lamps will be displayed one on each side of the rear of every train as markers to indicate the rear of the train; by day, unlighted, showing green lenses to the front and side and red lenses to the rear; by night, lighted, showing green lights to the front and side and red lights to the rear; except when train is clear of the main track, when by day green lenses and by night green lights must be displayed to the front, side and rear, and except when a train is turned out against the current of traffic, when by day green lenses and by night green lights must be displayed to the front and side, and to the rear by day green lenses and by night green light towards the inside and by day a red lens and by night a red light to the opposite side.

"By night freight trains will in addition display a light in cupola of the caboose, showing green to the front and red to the rear, except when a freight train is clear of the main track when green light must be displayed to the rear."

Other facts appear in the opinion.

At the close of plaintiff's testimony defendant moved for a nonsuit, which was denied, and at the close of all the testimony, moved for a directed verdict, which was also denied. There was a jury trial and a

verdict and judgment in favor of plaintiff for $15,000, from which judgment defendant appeals.

AFFIRMED.

For appellants there was a brief over the names of *Mr. W. A. Robbins, Mr. A. C. Spencer* and *Messrs. Crawford & Eakin,* with an oral argument by *Mr. Robbins.*

For respondent there was a brief over the names of *Mr. George W. Peterson, Mr. George C. Styles* and *Mr. R. J. Green,* with an oral argument by *Mr. Peterson.*

McBRIDE, C. J.—1. There are several assignments of error, but the principal contention centers upon the court's refusal to grant a nonsuit, or direct a verdict, on the alleged ground that there was no evidence tending to show negligence on the part of the employees of defendant, who were in charge of train 2140. As a preliminary to the discussion, we may call attention to Section 3 of Article VII of the Constitution, which, as now amended, provides that,—

"No fact tried by a jury shall be otherwise re-examined in any court of this state, unless the court can affirmatively say there is no evidence to support the verdict."

We have frequently held that we are precluded by this section from considering the weight of evidence, where there is any substantial testimony to support the verdict, and in the present case we shall only consider the testimony of plaintiff, with a view of ascertaining whether there is such testimony shown in the record.

2. Again, this being an action under the Federal Employers' Liability Act it follows from the terms of the act, that if there is evidence of negligence on the part of the defendant, which contributed to the injury, we cannot consider the question of contributory negligence on the part of the plaintiff. Such contributory negligence going only to the question of damages, concerning which phase of the case no fault is found with the instructions given at the trial: *Stool* v. *Southern Pacific Co.*, 88 Or. 350 (172 Pac. 101).

3-5. It is a fact not disputed, when 2140 arrived at the home signal it indicated that a train was within the block a short distance ahead, and was, therefore, a warning of danger, and indicated to those in charge of that train the necessity of proceeding cautiously and under such control, which would seem necessary, in view of the circumstances, to prevent a collision with the train within the block. Under these circumstances the rules of the company made it the duty of those in charge of 2140 to stop for five minutes and proceed under control at a speed not exceeding six miles an hour. The testimony of defendant in regard to the rate of speed actually made does not assume accuracy, but is to the effect that the train proceeded at about six miles an hour, but for the purposes of this discussion it may be assumed that the actual speed was six miles an hour, and it is assumed in defendant's argument that if this was the case the train was "proceeding under control" within the meaning of the rule; but this is a mere assumption not justified by the language of the rule. The words "under control" mean, "to be able to stop within the distance the track is seen to be clear." The words "not to exceed six miles an hour" are words of limitation, and if a lower rate of speed is necessary to enable those in charge

of the train to observe whether the track is clear ahead, and to stop in time to avoid a collision, the train is not under control until its speed is reduced to that minimum. Therefore, if the circumstances— darkness or want of a headlight on the tank—rendered it impossible to see objects on the track ahead, and to stop in time to avoid them, while running at the rate of six miles an hour, it was the duty of those in charge of the train to run at such reduced speed as would seem reasonably sufficient to enable them to do so, and a failure to so control the speed would be negligence.

The question as to whether or not the tail lights on 255 were burning was for the jury. McClure, the conductor of 255, testified that they were burning at Camp, less than two miles from North Fork. It is possible, but not at all probable, that they had all gone out in the short time that elapsed between the time McClure observed them and the time of the collision. That one of these lights might be burned or jarred out, is possible, but that all three should expire simultaneously, is not within the bounds of probability. It is true the testimony of the conductor of 2140 indicates that they were not burning, but it should be remembered that he is a witness having a great interest at stake. If the lights were burning and he failed to observe them, it would indicate a negligence on his part that places the responsibility for the accident, and Fuller's death in consequence of it, upon his shoulders; and he naturally might be inclined to shield himself and color his testimony. The foregoing does not indicate the writer's view of the testimony, but it is an aspect of the case which might reasonably appeal to a trier of the facts, and a jury might reasonably weigh his testimony, in view of his connection with the accident, against the strong

probabilities against its accuracy developed by Mr. McClure's testimony, and legitimately come to the conclusion that the preponderance of the evidence indicated that the lights were burning when the accident occurred.

Conceding, however, for the purposes of the discussion, that the tail lights on 255 had been extinguished, although this seems improbable, there was still some evidence introduced by the plaintiff which tended to show that there was natural light sufficient to have enabled those in charge of 2140 to have observed the caboose of 255, and stopped in time to avoid the collision, if they had observed a cautious outlook. As shown in the statement, the witness Hoskins testified that daylight was breaking and that he was able to discern objects, such as a man or a car, at a distance of 200 or 300 feet; and this is borne out by the natural conditions shown by the almanac, and of which the court takes judicial notice without proof.

One witness, L. F. Spoar, who testified he had had fourteen years' experience as a locomotive engineer, testified that under the track conditions existing from the east end of the bridge at North Fork to 300 feet beyond, 2140 could have been stopped within about 75 feet. Now take this testimony in connection with the testimony of Hoskins, that it was light enough to have seen a car 200 feet, and we have evidence indicating, that with proper lookout, those in charge of 2140, had an opportunity to have seen the caboose of 255 and to have stopped their locomotive in time to have averted the accident, even if they were running six miles an hour.

These facts were sufficient to take the case to the jury upon the question of negligence of the defendant.

6. It is not clear from the testimony exactly what

was meant by the statement that Fuller had agreed with Chapin to flag 2140 into North Fork. It is evident there was no understanding that he would flag them in until his own train "was in the clear." He had not agreed to flag them against his own train but against No. 4. That is to say, that when 255 had got upon the passing track with room left for 2140, Fuller would flag against No. 4 so that 2140 could safely follow in upon the passing track. This seems the probable meaning of the agreement, as we understand the testimony.

Now as to Fuller's duty to flag under Rule 99, the rule, as quoted in the statement, does not absolutely require a flagman to go back with stop signals every time the train stops, and everyone who is accustomed to railway travel, knows it is not done. It is only "when a train stops or is delayed under circumstances in which it may be overtaken by another train" that the flagman is required to go back and flag. This leaves something to the judgment of the flagman and the conductor as to the conditions which may or may not involve a liability to be overtaken by another train.

On cross-examination McClure testified as follows:

"Q. Now, Mr. McClure, going into a station like North Fork, where you know you are going to head in on the passing track, it is the duty of the flagman to be there ready to go out flagging immediately?

"A. Well, under ordinary circumstances we stop and head right in. I wouldn't expect it, no, sir.

"Q. Do you know where the S. board is there at North Fork, or was at that time?

"A. I know about where it was, yes.

"Q. Where was it with reference to the hind end of this train, when you stopped your seventy cars to head in?

"A. Well, the caboose was outside the S. board at that particular place.

"Q. Do you mean to tell this jury when you stopped to head in, and your hind end is outside the S. board, you don't have your flagman go out?

"A. Well, it is not customary. That is, where you stop and head right into a place. Of course if you are delayed any length of time they are supposed to go right back.

"Q. What do you call being delayed any length of time?

"A. Well, I should think a delay of three or four or five minutes.

"Q. Would you let the hind end of your train stick out there three or four or five minutes before you would send your flagman out?

"A. Well, that would depend.

"Q. Well, what would it depend on?

"A. Well, it would depend on conditions—of the track and grade and such as that.

"Q. Well, I am asking you with reference to conditions as they existed there at that time and place, and this grade and this track?

A. Well, it was his duty to go out and flag there at that place.

"Q. And it was his duty to go out immediately?

"A. Yes.

"Q. And he should have been in a position to go out and flag immediately, under those circumstances, should he not?

"A. Yes.

"Q. And he understood that is where he should have been?

"A. Yes."

We think the above testimony clearly indicates that it was not customary for the flagman to go back at an ordinary stop made for the purpose of heading in on a switch, but that if anything unusual occurred, such as the breaking of the train, or there was reason to expect some danger from the rear, it was his duty to go immediately. The breaking in two of the train was such

a contingency but, according to Hoskin's testimony, the collision happened almost at the same moment. Whether Fuller was in the act of starting or preparing to start with his lantern and fusees, is not disclosed. His body was in an erect position when it was found, so he was probably on his feet, and as he had been prompt to go out and flag on other occasions on the same run when the train separated, it would be unfair to assume that he was not equally diligent on this occasion. Irrespective of any presumption that he was doing his duty, there is small ground for the assumption that he was neglecting it.

Most of the testimony introduced by plaintiff on this phase of the case was necessarily drawn from persons who were, at the time of the accident, in the employ of the defendant, and some of whom a verdict in favor of plaintiff would impliedly convict of negligence. Under the circumstances, it is safe to say that they were, to a certain extent, unwilling witnesses, and that nothing was volunteered that was prejudicial to defendant; but with all these drawbacks we think the plaintiff presented a case sufficient to go to the jury, and that defendant fell short of making one showing the negligence of the deceased was the sole cause of his death, if indeed it has shown that he was negligent in any particular.

7. While the defense of assumption of risk is permissible in actions brought under the Federal Employers' Liability Act, it is settled that it does not apply to extraordinary hazards created by negligence of a fellow-servant: *Stool* v. *Southern Pacific Co.*, 88 Or. 350 (172 Pac. 101). The order permitting plaintiff to amend the reply was within the sound discretion of the court, and we are not prepared to say that such discretion was abused in the present instance.

8. The defendant urges there was error in the following instruction:

"Now, you are instructed that the burden of proving that Fuller was guilty of contributory negligence, is upon the defendant, and in this connection you are instructed that in a death case, such as this is, there is a presumption that the deceased exercised reasonable care for his own safety, and the deceased is entitled to the benefit of this presumption, unless you find under all of the facts and circumstances of the case, by a fair preponderance of the evidence, that Fuller was negligent and such negligence contributed to cause his injuries and death."

We think the instruction was proper under the circumstances. The contention of defendant was, that the negligence of the deceased was the sole cause of the accident. The case was in this position: (1) It was incumbent upon the plaintiff in the first instance to show the negligence of the defendant's servants in charge of 2140, and there was in their favor a presumption to begin with, that they performed their duty and exercised reasonable care for their own safety and for the safety of other trains on the road. When it attempted to impute negligence, either contributory or sole, to deceased, plaintiff was entitled to invoke the same presumption in favor of his conduct. This is the doctrine sanctioned in this state in *McBride* v. *Northern Pacific R. R.*, 19 Or. 64 (23 Pac. 814, 42 Am. & Eng. Ry. Cas. 146). The presumption is not invoked primarily for the purpose of showing that the defendant was negligent, but for the purpose of placing upon the defendant the burden of proving the negligence of deceased. The instruction stated the law so far as it went and there was no request for an instruction to like effect on behalf of the defendant.

In view of the fact that the court in its charge reiterated several times the statement that the burden of proof was upon the plaintiff, to establish by the preponderance of evidence the negligence of defendant, so this must have been thoroughly impressed upon the mind of every juryman. We do not think it was possible for the jury to have formed any impression, prejudicial to defendant, from the failure of the court to say in direct language that defendant's servants were presumed to have done their duty, and not to have been negligent. The charge seems to be eminently fair and clear.

9. It is urged as error that the court permitted evidence tending to show that Fuller might have been somewhere else on the train than in the caboose, when the collision occurred, and that as the complaint alleged he was in the caboose and attending to his duties, the introduction of such evidence was prejudicial. To this objection it may be answered that there was no testimony admitted tending to show that deceased was anywhere else than in the caboose at the moment of the accident. The complaint alleged this; the answer admitted it; all the evidence showed it and nobody disputed it. Where he was a minute before the collision, or during the stop, was not pleaded. In detailing the circumstances immediately preceding the collision, it would not have been far-fetched or improper for plaintiff to have shown the general duties of deceased in connection with the train, or that he had such duties as might have required his immediate attention before he entered the caboose. The questions asked elicited nothing prejudicial to defendant, and did not tend to contradict any fact alleged in the complaint.

10. Another assignment of error is in regard to the instruction of the court, leaving to the jury the ques-

tion of negligence by reason of the failure of the defendant to have upon the westerly end of the tank an electric headlight. This objection is urged with much force and plausibility, and to discuss it properly. it is necessary to consider the state of the pleadings and proof upon this branch of the complaint.

Subdivision 10 of the complaint is as follows:

"That during all the time hereinbefore mentioned and alleged and on the day and at the time of the happening of said accident and injury to said Fuller hereinbefore alleged, it was the duty of the defendant to equip, maintain and use its said certain locomotive engine then and there being operated and handled over the defendant's said main line track towards and in the direction of the said caboose wherein said Fuller was stationed and situated at said time at the forward or westerly end thereof, with an electric headlight, of sufficient candle-power, measured with a reflector, to throw a light in clear weather, that would enable the engineer, who was then and there operating, handling and controlling said locomotive engine, to plainly discern an object the size of a man, or larger, and more particularly the caboose on which said Fuller was then and there stationed and situated, as hereinbefore alleged, at a distance of not less than 800 feet therefrom, and to maintain and use such headlight upon said Westerly and forward end of said locomotive engine at the time and place where the said accident and injury to said Fuller occurred, to the end that said locomotive engineer might see and observe obstacles or obstructions upon the track, such as other engines, cars or trains, in ample time to stop and thereby avoid same."

Having thus stated the duty of the defendant, subdivision 11 proceeds to set forth the breach of such duty as follows:

"On the morning of September 3, 1917, defendant negligently and unlawfully propelled and operated

along its main line track in a westerly direction, the said locomotive engine hereinbefore mentioned and described, which said locomotive engine was not then and there equipped with an electric headlight at the forward and westerly end thereof, of the candle-power required by law, as hereinbefore alleged, and the defendant negligently, wrongfully and unlawfully failed to equip, maintain and use at the forward and westerly end of said locomotive engine, then and there being operated backward along over its said main line track, any headlight at all, so as to enable the engineer operating and handling said locomotive engine, to see and discern upon the said track, any obstacle or obstruction thereon in time to avoid accident or collision therewith.''

The charge of the court, in relation to the matter thus pleaded, was as follows:

''It is likewise charged in the complaint that the defendant negligently operated extra 2140 without having a standard headlight on the front end thereof, having in mind the direction in which extra 2140 was running, or in other words, that there was no standard headlight on the rear end of the tender. This charge of negligence is practically the equivalent of the charge that the defendant negligently operated extra 2140 backwards. The court submits to you the issue in this connection, whether, if the defendant chose to operate extra 2140 backwards, it failed to exercise ordinary care by reason of not having the rear end of the tender equipped with a standard high-power headlight. If you find that the defendant was negligent in the particulars in question, and you further find that such failure so to equip with a standard high-power headlight proximately resulted in the collision of extra 2140 with the rear end of No. 255, and resulted in the fatal injuries to Walter Francis Fuller, it is your duty to find for the plaintiff.''

The language of the complaint, alleging the duty of the defendant with reference to lights upon the loco-

motive, is substantially identical with the requirements
of Rule 29, promulgated by the Interstate Commerce
Commission on December 26, 1916, although no refer-
ence is made in the complaint to such rule, which reads
in substance as follows:

"Each locomotive used in road service between
sunset and sunrise shall have a headlight, which shall
afford sufficient illumination to enable a person in the
cab of such locomotive * * to see in a clear atmos-
phere a dark object as large as a man of average size,
standing erect, at a distance of at least 800 feet ahead
of such headlight. Each locomotive used in road ser-
vice, which is regularly required to run backward for
any portion of its trip, except to pick up a detached
portion of its train, or in making terminal movements,
shall have on its rear à headlight, which shall meet
the foregoing requirements. * *

"It is further ordered that said rules shall apply
to all locomotives constructed after July 1, 1917, and
for locomotives constructed prior to that date, the
changes required by the above rules shall be made the
first time locomotives are shopped for general or
heavy repairs after July 1, 1917, and all locomotives
shall be so equipped before July 1, 1920."

It does not appear either from the complaint or the
testimony that the locomotive in question was regu-
larly required to run backward, or that it was con-
structed after July 1, 1917, or that it had been shopped
for general or heavy repairs, after the promulgation
of the above order, therefore, if there was any liability
for the failure of defendant to have such a headlight,
as described in the complaint, upon the rear end of
2140 on the night of the accident, it would have to be
found under the general clause of the Employers'
Liability Act and not under the rules of the Interstate
Commerce Commission. The Federal Employers'
Liability Act does not undertake to define negligence,

but leaves the term to stand as defined at common law, so that the question as to whether it was common-law negligence to run train 2140 backwards, on that trip, on that grade and under the atmospheric and natural conditions then existing, and with the knowledge that there was a train close ahead and a final warning of danger at the home signal, without such light as that alleged in the complaint to have been necessary, was, we think, one which the court had a right to submit to the jury.

We do not understand that the orders of the Interstate Commerce Commission fix, or are intended to fix, the maximum of negligence in the use of lights, or in the operation of trains. The trip to be made was from the summit of a high range of mountains down a steep grade and in the night-time. Whether the circumstances justified defendant's agents in making it without waiting for daylight, or until they could get to the turntable and turn around, so as to proceed with their light in front, was a question for the jury. Whether making the trip under the circumstances without such a light on the rear, as the wisdom and experience of the Interstate Commerce Commission had found sufficient for the safe operation of a train proceeding regularly, was also a question for the jury. For the defendant's employees to go banging down that grade in the dark at the rate of six miles an hour, with the home signal indicating danger, and with the knowledge that there was another train less than a mile away standing upon the same track, would appear to the average layman to have been an almost reckless proceeding, and yet this is the situation shown by the testimony of defendant's employees upon train 2140.

If circumstances ever existed where the best of light or the greatest caution should have been used, they

are shown by the testimony of defendant's conductor to have been present here. He is not shown to have been running under orders; neither is it shown that it was necessary that he should have made the trip in the night-time, and it was proper for the judge to submit to the jury the propriety of his running an unequipped, unlighted train under the conditions.

The language used by the court in the instruction in describing the headlight, might be subject to some criticism from an expert railroad man's standpoint, but we think it in no way misled the jury.

Other minor objections are urged and have been carefully considered, but we deem them without merit. The real and vital questions upon the trial, and those chiefly argued here, were (1) the alleged sole negligence of deceased, and (2) the instruction of the court in regard to the train backing down without a headlight. These have been the subjects of long and serious consideration, with the result above indicated.

The judgment is affirmed.              AFFIRMED.

Denied July 22, 1919.

ON PETITION FOR REHEARING.

(181 Pac. 991.)

Petition for rehearing denied.

*Mr. W. A. Robbins, Mr. A. C. Spencer* and *Messrs. Crawford & Eakin,* for the petition.

*Mr. George W. Peterson, Mr. George C. Styles* and *Mr. R. J. Green, contra.*

In Banc.

McBRIDE, C. J.—In a vigorous petition for rehearing, the soundness of the opinion heretofore rendered is challenged in several particulars.

It is first called to our attention that in several instances the opinion refers to Guy E. Chapin, the engineer in charge of train 2140, as the "conductor" instead of the "engineer," and this criticism is technically correct. Train 2140 consisted of a locomotive with tank attached and had no technical conductor, but was in charge of the engineer; but we submit that being in charge of the locomotive, his position approached quite as nearly that of a conductor, as the locomotive and tank approximated to a train, which is what defendant's witnesses called it. We apologize, and hereafter Mr. Chapin will be known and designated in the Oregon Reports as "Engineer of Train 2140."

Our attention is also called to the fact that we have inadvertently called the intermediate signal, half a mile east of the North Fork bridge, the "home signal" and this criticism is also correct; but we call attention to the fact that it showed just as red and indicated danger just as effectually as though it had been designated by its proper title, and Engineer Chapin says that it was "red and showed danger." The opinion nowhere indicates that train 2140 ran past the intermediate signal without stopping. It did stop for five minutes and then, with the danger indication still showing, went ahead at the rate of at least six miles an hour with the knowledge on the part of those operating it that 255 was on the main track half a mile ahead.

11, 12. We are also criticised for saying, in effect, that if the tail light of 255 had been burning, the engineer of 2140—called in the opinion, the "conductor"

—could have discovered that fact at a distance of 200 feet east of the bridge, if other conditions had been favorable. Such is the testimony of Hoskins, which, for the purpose of an appeal, is conclusive, but stronger than this is the testimony of Engineer Chapin, who testified as follows upon cross-examination:

"Q. If those tail lights had been burning in the caboose, which you say they were not, you would not have had any difficulty in seeing the end of the caboose and stopping 2140?

"A. No, sir."

This left for the jury the question as to whether the tail lights were burning, and—as shown in the original opinion—they had a right to weigh the statement of a witness having a strong moral interest in the result, against the intrinsic improbability that all three of the tail, or marker lights, which are independent of each other, should have been extinguished, when it had been shown that all three had been burning a little over two miles back; and especially when Engineer Chapin's testimony, as to natural light conditions, had been contradicted by Hoskins, an entirely disinterested witness.

It is earnestly urged that the testimony shows that 2140 was running "under control" at the time of the accident. It is true that several very estimable gentlemen connected with the railroad, testified that in their opinions such was the case, but, viewed from the standpoint of the rules, their judgment is not sustained. The words "under control" are defined in the defendant's book of rules, as follows: "Under Control: To be able to stop within the distance track is seen to be clear." This does not mean to run six miles an hour, which is the maximum speed at which a train may be said to be under control under any cir-

cumstances, but means such a rate of speed as, under
the particular conditions, will enable those in charge
of a train to stop in time to avoid accident.  If the
circumstances are such that objects upon the track
may be discovered, a considerable distance ahead, six
miles an hour may be a sufficiently low rate of speed,
but if there is a considerable downgrade, combined
with dark or foggy weather, and no light in front of
the train, a speed of one mile an hour may be required
in order to conform to the rule.  Taking defendant's
testimony alone, there was every condition demand-
ing the most extreme caution.  The route was over a
heavy downgrade from the summit of a high range of
mountains; the locomotive left Kamela in the night,
backing down this grade without any light upon the
tank, which then constituted the front of the train;
what little natural light, that ordinarily would have
existed, was diminished by smoke; the intermediate
signal east of North Fork showed a train on the main
track, about half a mile ahead.  Under all these cir-
cumstances it was for a jury to say whether defend-
ant's engineer acted prudently in maintaining a speed
of six miles an hour and, considering the force and
physical consequences of the impact, whether he in
fact was running at so low a rate of speed as that
claimed by him.  They were the exclusive judges of the
value of his testimony as to the conditions and speed
of the train, and we think there was sufficient testi-
mony to justify a finding that he was negligent.

It is true that there is evidence on behalf of defend-
ant, tending to explain these circumstances, but the
people of this state, in their collective wisdom—or
unwisdom—have seen fit to ordain that in law actions,
the comparative weight of testimony shall not be ex-
amined upon appeal, and, therefore, we are precluded

from a full discussion of that subject, having no right to substitute our own judgment for that of the jury.

Our statement, that it was fairly deducible from the evidence, that Fuller had agreed to flag 2140 against No. 4 passenger, is criticised as not borne out by the testimony. Let the testimony speak for itself. On page 218 of the evidence we find the following testimony of Engineer Chapin upon cross-examination:

"Q. And, if necessary, Fuller would flag you against No. 4?

"A. Yes.

"Q. Of course No. 4 was a passenger train?

"Mr. Crawford: I think you are misquoting the witness in saying he was to flag as against No. 4.

"Q. Then Fuller was to flag you and protect you as against No. 4.

"A. Yes."

Whether sufficient time elapsed between the breaking in two of train 255 and the collision to have enabled Fuller to get his lantern and fusees and start back east to signal 2140, were questions of fact for the jury. As remarked in the original opinion, it may well be that he was in the act of starting when the collision occurred. The only voice that could have explained his movements is stilled by death, and we are not prepared to say that he, who is shown to have been careful and diligent upon other occasions during the trip, was neglecting his duty and recklessly exposing his own life in this instance.

Our attention is called to the fact that the train order for 2140 is in the transcript. This criticism is correct, although the fact itself is not material. The order reads: "September 3, 1917. Engine 2140, run extra Kamela to Pilot Rock Junction; take siding, meet extra 2162 east at Duncan." No time of starting

is given.    How long 2140 would have been delayed at
Kamela, in order to have turned around and proceeded
west with the locomotive in front, does not appear.
There is a long double track at Kamela and the train
sheets indicate that the only train there when 2140 left,
was the one 2140 had helped to pull up the grade to
that point.    This train was due to proceed on its east-
ward course and it would seem, under the conditions,
reasonable prudence would have dictated that 2140
should have delayed its departure a few minutes and
turned around, so its engineer might have the benefit
of the powerful lights on the locomotive on the west-
ward trip.    At all events, the order does not indicate
that 2140 was required to run backward.

While it is not negligence *per se* to run a train
backward, and while it is not unusual for trains to be
so run, especially in daylight and for comparatively
short distances, conditions may exist when so operat-
ing a train, and especially in the dark and down steep
grades and without lights sufficient to indicate possible
obstruction on the track, may constitute negligence,
and this is as far as the original opinion goes or was
intended to go.

The court's instruction as to the headlight was, we
think, sufficiently discussed in the original opinion.
We think it fair to assume that the headlight, required
by the Interstate Commerce Commission, which is
shown to be one of high power, supposed to disclose
objects one thousand feet ahead of the train, is the
standard headlight, made so by the order and by
general acquiescence and used all over the country,
and this, evidently, was what was in the court's mind
when the instruction complained of was given.    The
complaint charged, in substance, that neglect to have
such a light on the west end of the train was one of

the causes contributing to the accident.   We are of the opinion that there is evidence tending to show that if such a light had been maintained, the engineer of 2140 would have seen the caboose of 255 in time to have stopped his train; so that in any event it was not error for the court to instruct as it did in regard to that branch of the case.

The objection urged seems more to the court submitting to the jury the question of the propriety of running without the light particularly described in the instruction, rather than the necessity of having *some* kind of light.   Had there been any light whatever on the tank, and a dispute as to its sufficiency, an instruction of the character indicated might possibly have been prejudicial; but it is conceded that there was no light of any kind on the tank except the markers, which it is also conceded were not useful in enabling the persons operating the train to discern obstructions on the track, so the instruction in substance left the jury to determine whether it was negligence for defendant's servants to operate the train without lights under the conditions disclosed by the testimony.

The jury were fully instructed in accordance with the contention of defendant as to Fuller's duty to go back and flag trains when his own train was delayed upon the track; whether he had time to do this after he became aware that his train was more than momentarily delayed, for the purpose of heading in, was left to the jury.   Whether there was time for him to have gotten his lantern and fusees and got out of the caboose, was a question of fact for the jury.   While, in view of the testimony and the instruction of the court, the statement in the original opinion that "The rule does not absolutely require the flagman to go back with stop signals every time the train stops,"

etc., may be in the nature of *dictum,* the writer, speaking for himself, is firmly of the opinion that the rule bears the construction indicated.

Taken as a whole, we are of the opinion that the trial and instructions were eminently fair to the defendant, and that no substantial error was committed to its prejudice; and that while this court sitting as a jury of seven to try the facts, might come to a different conclusion from that arrived at by the jury that tried the cause, there is sufficient evidence to support their finding.

We adhere to the conclusion reached in the original opinion.          Affirmed.    Rehearing Denied.