Argued October 10; affirmed November 19, 1929

# ELIZABETH MEANEY *v.* PORTLAND ELECTRIC POWER CO.

(282 Pac. 113)

For appellant there was a brief and oral argument by *Mr. Leroy Lomax.*

For respondent there was a brief over the name of *Messrs. Griffith, Peck & Coke* with an oral argument by *Mr. Cassius R. Peck.*

McBRIDE, J.   We shall first consider briefly the locus of the accident as detailed by the plaintiff in

connection with the actual physical facts which can not be gainsaid. On the evening of the accident Kenneth Liebhart and Mr. Ford, both residing in the vicinity, were taking plaintiff and another young lady, Miss Sweaney, for a pleasure drive in Liebhart's Ford touring car, 1924 model, equipped, as Liebhart says, with new brakes and good lawful lights, which had been adjusted as required by law. In the course of their journey they came into the Courtney Road, which runs east and west at approximately right angles to the defendant's railroad about a quarter of a mile east of where the accident occurred. Liebhart and the plaintiff were both familiar with the road and the crossing. The night was very dark and cloudy. For a distance of 200 feet east of the crossing one can see the track for a distance of two or three blocks to the north, and for perhaps 200 feet to the south in the daytime. The highway has a slight grade downward toward the railroad crossing and a slight grade upward toward the west on the west side of the crossing. The photographs introduced in evidence, the accuracy of which is not questioned, would indicate that the grade in either direction is exceedingly slight, but not sufficient to interfere with the control of the car, and it is not claimed that it did have that effect. The driver claims that on approaching the track from the east he slowed down to 15 miles an hour, and, by reason of the extreme darkness of the night, and the fact that the road had recently been tarred black and the reach of the logging car being also black, the color, or want of color of the road and the reach of the car so blended, that he was unable to see that defendant's car was across the road and drove into it, his radiator going underneath the reach to the windshield, the collision causing the

injury complained of. The road is an ordinary county road, its legal width being probably 60 feet, but having only 16 feet of pavement consisting at that time of oiled or tarred macadam. The road had considerable travel and served the needs of a considerable community residing along and near it. It would not be fair to say that the travel was congested or enormous like a city street, but rather that it was a considerably traveled county road. Mr. Boffinger, one of the plaintiff's witnesses, testified that "on Sundays and holidays, there is quite a traffic, but otherwise the traffic is not very heavy." In fact, there is no evidence to show that there are any conditions of location or traffic to differentiate this crossing from many other crossings along the route of this railroad and other roads across the state.

■ We have held in this state, and in conformity with a great majority of the holdings of other states, that, unless the evidence shows that the crossing is particularly dangerous, there is no legal duty on the part of the railroad company to maintain lights, gates or a watchman for the protection of travelers upon the highway.

In *Russell v. O.-R. & N. Co.,* 54 Or. 128, 136 (102 Pac. 619), we held that, where the evidence showed that the crossing was exceptionally dangerous, the question of the necessity of lights or gates, or a watchman, should be submitted to a jury, the summing up of our whole utterance on this question being as follows:

"But we do not wish to be understood as holding that the necessity for a flagman, or warning signal, is in all cases a question which ought to go to a jury. It is only necessary for us to hold, so far as this case is concerned, and in any other case where the *undisputed*

*testimony* shows extraordinary dangers, that it is not error for the court to submit to the jury the question whether reasonable care for the safety of the traveling public demands that a watchman or other method of warning than the use of the bell and whistle be adopted.''

The italicized words are not in the original opinion, but are so placed here to indicate the trend of the court's thought in that case. See also *Hornschuch v. Southern Pacific Co.,* 101 Or. 280 (203 Pac. 886) ; *Trask v. Boston & M. R. R. Co.,* 219 Mass. 410 (106 N. E. 1022) ; *Morris v. Atlantic City R. Co.,* 100 N. J. L. 328 (126 Atl. 295). The case last cited is similar to the case at bar in many particulars, especially in that the driver was acquainted with the crossing, knew that it had no gates or bars or lights, and also that the night was dark. In fact, every condition obtained in this case, except that in the New Jersey case the night was foggy as well as dark. See also a discussion generally of the subject of the necessity of lights, gates, et cetera, at crossings, 22 R. C. L., 1006, et seq.

Counsel for plaintiff attempts to differentiate these cases from the case at bar, on account of the construction of the logging cars in this train from the usual baggage cars, which comprise a large part of the freight trains, and contends that, because of the difference in construction of the logging cars, a different rule should be applied. The train consisted of approximately 26 cars with two motors in front. Next to the engine was, first, a merchandise car, then a box car, and after that some ordinary flat cars, and next 20 logging cars, and last a caboose. It was one of these logging cars which was across the highway and with which the automobile, in which plaintiff was riding, collided. The construction of the logging cars, as the

evidence and photographs introduced disclose, is about as follows: The cars are approximately 52 feet long. They have a reach answering to a coupling pole running the entire length of the car and a bed consisting of timbers bolted together and aggregating 3 feet in width. The reach is 9¾ inches up and down and 3½ inches transversely, and, so far as we are able to judge, is the only thing that would present itself to the view of an approaching automobile, the bed being below the top of the reach. However, there is an air chamber attached to the reach or bed and approximately in the center of the car which apparently by comparison with the reach in the photographs is about seven or eight inches wide, and would present a surface of that extent and from 12 to 14 inches long toward the highway. Underneath this bed or reach and supporting it were the forward and rear trucks which were approximately 30 feet apart, and it was this part of the car that was across the road when the accident occurred. The top of the beam or reach was 3 feet and 4¾ inches above the rails. The beam was of a dark color. There had been another accident on the road, less than a minute, probably about 45 seconds before this one, which occurred by another auto having run against the train while it was moving southward about 12 miles an hour, and the train at the first collision was either stopped to prevent the injury, or by the breaking of the air connection from the impact, there being a difference in the testimony on this point. However, it was so apparent that the train stopped from one of the other of these causes, that the court, there being no evidence to the contrary, instructed the jury that, so far as the stoppage of the train was concerned, it was an emergency stop; so, as far as the trial then pending is

concerned, the jury was bound to say that it was an emergency stop, and, as a natural consequence, that it was not unlawful. While it may stretch credulity somewhat to accept the statement of the driver of the car that it was so dark that with good lights on the car they could not distinguish this car across the track with its face of 9¾ inches and the additional face of the air container, it is not necessary to say, for the purposes of this case, that the statement that they were unable to see the danger is absolutely incredible. Perhaps there was enough to go to the jury on that subject as indicating want of contributory negligence. Evidence that there were no station lights burning may have been proper for the same purpose as showing the general conditions at the time.

▮ It was error for the court to admit evidence that a community light near the crossing had been discontinued for a year. The railroad company, in our view of the evidence, was not required to furnish a light at this crossing, and was under no obligation to keep burning a light over which it had no control, and which was not erected or maintained by it. There are some authorities which hold that, where a railway company has for a long time maintained a light or gates at a crossing and then suddenly discontinues them without notice, a liability may arise. This is on the theory that, having by such a practice led the traveling public to rely upon certain conditions at a crossing, the company should not suddenly and without warning change the conditions upon which, by long continuance, it had led the traveling public to rely.

▮ The court erred in submitting the question of the lack of lights, gates or watchman, generally, to the jury, and no doubt the eminent and now deceased

jurist, who tried this case, so concluded when he granted a new trial. It was not error for the court to submit the question of failure to blow the whistle to the jury. The law in this respect only prescribes the minimum of precaution required, and considering the darkness of the night, the character of the train, and all the surrounding circumstances, it was for the jury to say whether the whistle was actually blown at a point four or five hundred feet north of the crossing, and whether, under all the circumstances, and, especially in the absence of a bell on the train, repeated warnings by whistling might have averted the accident.

■ The defendant claimed that, under the circumstances, its stop across the road was brought by circumstances over which it had no control, and that, so far as it was concerned, the accident was unavoidable. There was evidence which might or might not lead a reasonable jury to that conclusion. At least, defendant was entitled to have that phase of the case go to the jury.

The defendant requested the following instruction, which was refused:

"If you find from the evidence that the accident was unavoidable so far as the defendant was concerned, you will return your verdict in favor of the defendant company."

The failure to give this instruction, or its equivalent, was error.

■ It is also urged that the court erred in permitting evidence by certain witnesses that shortly after the accident they made observations and found that they could not see defendant's car across the road, said observation being made at only a short distance, 25 feet or so from the track. While the evidence may

not be strong or conclusive, we think the conditions are shown to be so nearly similar that it should have been admitted, and that there was no error in that respect. Otherwise, we think that the charge of the court, while technical objections may exist, was fair to both parties.

■ The case was a close one, barely sufficient to have been submitted to a jury, but we are of the opinion that there are phases of it that justified the court in so submitting it. The objection is made that certain of defendant's objections here to the failure of the court to give the requested instructions were not properly excepted to. The case is here under peculiar conditions. The learned judge, who sat in the trial, and who made the original order granting a new trial, died before the bill of exceptions was settled, and this was done by another judge who settled it evidently from the reporter's notes taken on the trial, which notes extended and including the whole of the reporter's account of the proceedings are attached as part of the bill of exceptions. This was the only method by which a bill of exceptions could be framed unless counsel could agree on a bill and it is evident that they did not. After the jury retired, the following colloquy occurred:

"Mr. Peck: Has the plaintiff any exceptions?

"Mr. Lomax: If the court please, the instructions were quite long in this case and there were a great number of requests on the part of the plaintiff, and a great number on the part of the defendant. I wonder if we could just have an order that each side may have a blanket exception to the refusal of the court to give the instructions that we requested?

"The court: Yes.

"Mr. Lomax: That would be fair to both parties, that would be. Now, as to the instructions given by your Honor, I don't know, it is pretty hard to follow

them you see to identify them, you gave the instructions in part and of course you modified them in part, and it is pretty hard for me to just state the ones that I wanted to except to, there were some exceptions that I wanted to take to the instructions as given by the court. On my part, in case of appeal by either party I am willing that we could have the same kind of blanket exception to the instructions that were given, if that would be fair to your Honor, otherwise take a little time to settle the exceptions.

"The court: I think that would be satisfactory except some time limit perhaps ought to be made before this goes entirely out of mind. You may have any reasonable time to take your exceptions, say 10 days?

"Mr. Lomax: Yes, say 10 days.

"Mr. Peck: That is hardly fair to your Honor. I have no objection but that is hardly fair to you to put this thing off and to take exceptions at any time. If there is really anything the matter with the instructions they ought to be called to your Honor's attention now so that you can call them to the attention of the jury. If I was in the court's place I should not want to stand for that, but I am not the one that should kick about it.

"The court: The only complaint there would be that if there is some instruction that you rather think that the court ought to correct at the present time like clerical errors or things of that kind, I wouldn't like to have you take 10 days on that.

"Mr. Peck: There was a clerical error in the first instruction that the court gave where you said plaintiff where you should have said defendant.

"Mr. Lomax: An attorney should not take advantage of a thing like that.

"The court: Well, suppose then that we shorten this time, you won't require that much.

"Mr. Lomax: Oh, no.

"The court: You won't require that much time to go through the instructions and take your exceptions, this morning or this afternoon?

"Mr. Lomax: Yes.

"The court: Very well. You can take this time to go through them."

While the matter is somewhat ambiguous, we think it was clearly intended by the court that a blanket exception should be allowed to all requests refused and time granted, a short time as indicated, for counsel to except to instructions actually given and that in considering the motion for a new trial filed three days later the court so construed the understanding arrived at. Under the conditions, and in view of the discussion between the court and counsel above cited, we think it but fair to treat the refusal to give the instructions as properly excepted to.

There are many interesting phases of this case that invite and might be worthy of more extended discussion, but the pressure of other cases equally important renders it impracticable to go into details.

The order of the circuit court granting a new trial is affirmed.

Brown and Belt, JJ., not sitting.