Argued January 18; affirmed June 7, 1949

# DOTY *v.* SOUTHERN PACIFIC CO.

**207 P. 2d 131**

*John Gordon Gearin* argued the cause for appellant. With him on the brief were Koerner, Young, Swett & McColloch, all of Portland.

*Frank J. Van Dyke,* of Medford, and *Samuel M. Bowe,* of Grants Pass, argued the cause for respondent. With them on the brief was Ben T. Lombard, of Medford.

Before LUSK, Chief Justice, and BRAND, BELT, ROSSMAN, BAILEY and HAY, Justices.

BAILEY, J.

This action arose out of a collision between an automobile driven by plaintiff, Peggy L. Doty, and a pas-

senger train operated by defendant, Southern Pacific Company, where Sixth Street intersects the main line track of the railroad company in Grants Pass, Oregon, on November 28, 1945. Joined with the Southern Pacific Company, as defendants, were J. O. Eifert and G. P. Burnett, engineer and conductor, respectively, of the train involved in the mishap. At the close of plaintiff's evidence, judgment of involuntary nonsuit was entered in favor of the individual defendants. From a judgment in favor of the plaintiff and against the defendant railroad company, the latter has appealed.

Sixth Street in the City of Grants Pass extends in a northerly and southerly direction; it is level and is 55 feet wide. On each side of Sixth Street there is a sidewalk, approximately 12 feet wide. The street is intersected at right angles, within a distance of 120 feet, by six tracks of the defendant company. Commencing with the northernmost track and proceeding southerly they are designated in the evidence as the team track, No. 2 track, No. 1 track, the scale track, the passing track, and the main line track. The distance between the south rail of the team track and the north rail of No. 2 track is approximately 8 feet; between the south rail of No. 2 track and the north rail of No. 1 track, approximately 40 feet; between the south rail of No. 1 track and the north rail of the scale track, approximately 20 feet; between the south rail of the scale track and the north rail of the passing track, 8.4 feet; and between the south rail of the passing track and the north rail of the main line track, 13.7 feet. Plaintiff was proceeding southerly on Sixth Street in her automobile when she was struck by the locomotive of a passenger train which was proceeding easterly on the main line track.

Plaintiff alleges in her complaint that at the time of the accident a Southern Pacific railroad engine was parked on a side track "just east of said Sixth Street" and was emitting smoke and steam and making considerable noise, and that a strong light from the engine was shining across Sixth Street. The complaint further alleges that "at said time and place there were parked on a sidetrack of said railroad, paralleling and lying directly north of the said main line track, a number of box cars belonging to said defendant railroad company, which said box cars were parked immediately west of the place where said main line track and said Sixth Street intersected, and that said box cars and said parked railroad engine with its noise, smoke, steam and strong light greatly limited the visibility and sensory capacities on the occasion herein referred to, which condition constituted an unusual hazard, and that the aforesaid facts were well known to defendants, and each of them."

Plaintiff charges the defendant with the following acts of negligence: (1) Failure and neglect to provide and maintain any warning signal, by mechanical device or otherwise; (2) failure to provide a watchman; (3) failure to warn plaintiff of the approaching train, knowing that an unusually dangerous situation existed at the crossing; (4) failure to give any warning by whistle, bell, or other device; and (5) failure and negligence to reduce the speed of the train and thereby avert said collision, after seeing that a collision was imminent and having an opportunity to realize and appreciate plaintiff's danger.

The railroad company and the individual defendants, Eifert and Burnett, filed a joint answer denying any negligence. In an affirmative answer and defense

they allege that plaintiff was negligent in that (1) she failed to stop, look or listen before crossing the track when she knew, or in the exercise of reasonable care ought to have known, that trains would be passing thereon at any time; (2) she operated said automobile at a speed greater than was reasonable under the circumstances; (3) she failed to look out for and see the approaching train which was then plainly visible to her had she looked, "and particularly failed to look from a place of safety, there being ample opportunity for her so to do"; (4) she failed to have her automobile under proper control; (5) she failed to heed the timely and plainly audible signals given by bell and whistle of the approach of said train; and (6) she failed to yield the right of way to the train. The affirmative allegations of the answer were denied by the reply.

■ Two questions are presented for determination on this appeal. They are (1) whether there was substantial evidence of negligence on the part of defendant, and (2) whether the plaintiff was guilty of contributory negligence as a matter of law. These questions were raised in the Circuit Court by defendant's motion for a directed verdict and by its motion for judgment notwithstanding the verdict. Of primary importance in their determination is the established rule that they must be resolved upon consideration of all the evidence, and the reasonable inferences derivable from it, in the light most favorable to plaintiff. She is entitled to the benefit not only of her own testimony but also of any evidence favorable to her introduced by the defendant. *Portland Postal Employees Credit Union v. United States National Bank,* 171 Or. 40, 49, 135 P. (2d) 467, 136 P. (2d) 259.

The accident happened about 7:45 a. m. on Novem-

ber 28, 1945. The weather was "foggy, more or less, kind of a fog and a mist almost like a rain." Plaintiff was en route from her home on the north side of the tracks to her place of employment on the south side. She had lived in Grants Pass for two months prior to the collision and had crossed the tracks in going back and forth to work for the month during which she had been employed. As she approached the railroad tracks she stopped at the regular railroad crossarm stop signal, which is about 15 feet north of the first or team track and about 130 feet north of the north rail of the main line track. She then started in low, shifted in second gear and continued at a speed of not over 8 miles an hour. As she proceeded across the tracks she observed on her right "nothing but boxcars". She stated that there was nothing on No. 1 track, west of Sixth Street, but that there were boxcars on both the scale track and the passing track to the west of the highway and that they were not over 24 and 20 feet, respectively, from the west curb of the street. She testified that a switch engine was on the scale track to the east of the highway and about two or three boxcar lengths therefrom, that it was facing west with its headlight shining toward Sixth Street, and that "it was puffing and working and the smoke and steam were coming up from the switch engine. * * * I could hear the engine puffing. * * * I wondered just what it was going to do. It didn't blind me, as far as that was concerned, but it did bother me." We quote further from her testimony as follows:

"Q. What if anything did you observe on your right as you approached—I am now asking you as you approached the main line track? A. Well, just boxcars setting right up there; there wasn't anything else to see.

"Q. When did you first observe the train on your right? A. When it was right on top of me.

"Q. What if anything did you do? A. I stepped on the gas but it didn't do any good.

"Q. Did you observe whether or not the headlights of that train were on? A. I'm not sure, because I just heard the big clang of the bell and it hit me.

"Q. What if anything did you hear as you approached the main track there? A. I didn't hear anything.

"Q. Did you hear any whistle or other noise? A. No sir; I did not.

\* \* \* \* \*

"Q. Mrs. Doty, as you proceeded south on Sixth Street, and as you approached the scale track, what did you do? A. I looked.

"Q. Which way? A. Both ways.

\* \* \* \* \*

"Q. And what did you do then as you passed the scale track in your automobile? A. Well, I looked that way to see what the switch engine was going to do, and I glanced the other way and there was nothing coming that I could see, and I didn't hear anything.

"Q. At what point on Sixth Street did you first observe the passenger engine of the train that hit you? A. Not until I was right on the main line."

On cross-examination she testified as follows:

"Q. \* \* \* Isn't it a fact, Mrs. Doty, that when you were on the track you looked up and there was the engine right close to you? A. Yes; it was right close to me.

"Q. And that would be about how far in feet, do you know? Would it be as close as I am to you now? A. It must have been close to that; close, anyhow.

"Q. * * * Was it five feet or ten feet, or was it so close you couldn't tell? A. I was too excited to tell, to tell you the truth.

"Q. The windows were up in your car? A. The windows were not up in my car. The driver's side of the window was down in my car.

* * * * *

"Q. Isn't it a fact that you did not see that train until it was right on top of you? A. It was very, very close; yes; so close that I couldn't get across ahead of it.

"Q. How far were you from the edge of the right hand edge of the sidewalk? A. Right along close to it.

"Q. How far? The width of a car, five feet or two feet, or six inches, or how far? A. Wouldn't have been over two feet, I don't think."

Mrs. Doty stated that she thought her automobile had a wheel base of about ten feet and that the driver's seat was "around four feet, five, from the front." She further stated that there was no automatic signal, warning device, automatic wigwag or watchman at the crossing.

C. E. Parsons was driving his automobile south on Sixth Street a short distance ahead of plaintiff. In the automobile with him were his wife, Olive Parsons, and W. R. Swacker. They barely missed being hit by the train which struck plaintiff. About the only thing which Mr. Parsons observed was the switch engine which, he stated, had its light burning and "was doing a lot of cutting up down there." Mrs. Parsons testified that she observed box cars on their right as they proceeded south. She said that they "were very close and obstructed the view down that way is all I could say. I couldn't say what track." On cross-examination she

testified that the only boxcars which she observed on her right were on the first two tracks (team track and No. 2 track) as they proceeded south on Sixth Street. The other passenger in the car, Mr. Swacker, testified that there "was a string of boxcars right next to the main line"; that he did not think they were over 8 or 10 feet west of the sidewalk; that he did not observe any cars on the scale track, and that the bell was ringing on the switch engine which was stationed to the east of Sixth Street.

H. L. Goodwin, who saw plaintiff's car spinning around immediately after it was struck, stated that according to his observation the passing track to the west of Sixth Street was empty but that a switch engine, with a caboose on one end and a boxcar on the other end, was on the scale track west of Sixth Street; and that the caboose, which was on the east end of the switch engine, was "around six or eight feet from the sidewalk." He further testified that all of the tracks north of the scale track "were blocked with boxcars, all of them", and that "the only view you would have [to the west] would be after you passed that third track there [scale track], because it was blocked until you got practically on the second track."

Edwin Chambers testified that he was the fireman on the switch engine, which was standing on the passing track on the west side of Sixth Street, waiting for the passenger train. He thought that his locomotive "must have been sixty feet" from the sidewalk. He did not "recall of any cars being between the engine and the sidewalk" but he was unable to state positively that there were none.

Ivan D. Simon, brakeman on the train involved in the collision, testified that about six minutes after the

accident he made an investigation, and that there was an engine and a car on the passing track approximately 90 feet east of Sixth Street; that on the scale track there were four cars, the easternmost of which was about 27 feet from the west curb of the street. He said: "I stepped clear back to that stop signal, and I stepped approximately a hundred feet, and then I walked back south, and I walked along the curb, and when I come to a point where I could look to the right and have a clear vision, then I stepped from there to the main line, and it was approximately 45 feet. * * * I mean a clear vision up the main line towards Portland."

R. P. Wood, fireman on the train here involved, gave the following testimony:

"Q. Did you see Mrs. Doty's car before the collision? A. Yes.

"Q. Can you come down here to the map and point out just about where you were when you saw Mrs. Doty approaching? A. When I first saw Mrs. Doty we were approaching Grants Pass, and I imagine I was sitting about eighty feet back from the highway and Mrs. Doty was approaching up the center line of traffic, going south on Sixth Street.

"Q. How far north of the main line was she at that time? A. I imagine about thirty feet when I saw her.

* * * * *

"Q. Were the brakes applied before the impact?

"A. As soon as I seen Mrs. Doty wasn't going to stop I hollered to the engineer to hold it, and he placed the train brakes immediately in emergency."

The engineer to whom Wood referred was J. O. Eifert, who stated that he was on the right side of the engine, and that the "front of the engine was right

about on the sidewalk when he [Wood] yelled 'Hold her!' " He stated that it was about 50 feet from the window of the cab to the front of the engine. We now quote from his testimony:

"Q. Were you drifting into the station, Mr. Eifert, that morning? A. Yes.

"Q. Making as little noise as possible? A. You don't make much noise with the drifting throttle. The whistle and the bell are all.

"Q. Other than the whistle and bell you were operating as quietly as normally possible for a train to operate? Yes.

\* \* \* \* \*

"Q. But you didn't get a call from the fireman until you were approximately right on the crossing, is that correct? A. Before I got on the crossing; right before I started, when the front of the engine started on the sidewalk.

"Q. That's when you got the call to hold it? A. Yes, and I just got through releasing the air. I always slow down here and Medford, ten miles an hour, because they are both bad streets, and if nothing happens I blow the whistle right on the crossing."

Wood testified that the bell is rung by an automatic device which is turned on by the opening of an air valve; that the "fireman is responsible for the bell; the engineer can ring it"; and that he turned the valve on "before we crossed the first crossing and it was ringing continually until the station." He further testified that the "engineer started blowing the whistle for the Sixth Street crossing immediately after crossing Fifth Street, and he had to take his hand off the whistle cord to apply the emergency brakes when I hollered 'Hold her'." The engineer corroborated the fireman's testimony as to the ringing of the bell and

the blowing of the whistle. Asked how many times he blew the whistle, he stated: "Four times, going between Fifth and Sixth Street. Two longs, a short and a long." Chambers, to whom we have hereinbefore referred, testified that he heard both the bell and whistle as the train passed him. Burnett, the conductor on the train, who was riding in the fourth car from the engine, testified that he heard the whistle before the emergency brakes were applied but he did not hear the bell ringing. Brakeman Simon, who was "in the head coach, four cars from the engine" testified that he heard the whistle blow prior to the application of the emergency brakes but did not remember whether he heard the bell or not.

Homer Grable, the fire chief of Grants Pass, saw the collision when he stopped his car at the intersection of Sixth and G Streets, approximately 150 to 160 feet from the place of the accident. Asked whether he had heard the bell and the whistle, he answered, "I'm not certain about the bell; I heard the whistle." Asked how long before the impact he heard the whistle, he answered: "I think it was just before the train entered the crossing." William L. Herron, who operates an automobile service station at the corner of Sixth and G Streets, stated that he saw the accident and was, at the time, inside of the station, and that prior to the accident he heard the bell ringing and the whistle blowing.

■ We shall now discuss the first question raised by defendant in its motion for a directed verdict, to wit: Whether there was sufficient evidence of negligence on the part of defendant to justify the submission of that question to the jury.

Sixth Street is 55 feet wide, with four or more

traffic lanes, and is the main highway in Grants Pass, a city with a population of more than 6,000 in 1940. This railroad crossing, consisting of six tracks in a populous city, is unlike ordinary crossings in the country. The evidence is somewhat conflicting as to which tracks, west of Sixth Street, had boxcars standing thereon, and how far the boxcars were from the west curb of Sixth Street. There is, however, substantial evidence that boxcars were on all of such tracks, with the possible exception of No. 1; that these boxcars were only a few feet west of the west curb of Sixth Street; and that they prevented those traveling south in automobiles on Sixth Street from seeing a train approaching from the west on the main line track until they were beyond, and south of, the boxcars on the passing track. There was also the distraction caused by the headlight shining from the switch engine, stationed to the east of the highway, and by the noise that it was creating.

In our opinion the Circuit Court did not err in submitting to the jury the question of defendant's negligence. There was substantial evidence sufficient to support findings that this was an unusually hazardous crossing and that the failure of the railroad company to maintain gates, flagman, or some warning signal at the crossing constituted negligence which was the proximate or one of the proximate causes of the accident. *Russell v. Oregon R. & N. Co.,* 54 Or. 128, 102 P. 619; *Fish v. Southern Pacific Co.,* 173 Or. 294, at 327, 143 P. (2d) 917, 145 P. (2d) 991; *Case v. Northern Pacific Terminal Co.,* 176 Or. 643, 160 P. (2d) 313. See also annotations, 60 A. L. R. 1106 and 1113. In *Chicago & N. W. Ry. Co. v. Golay,* 155 F. (2d) 842, the court submitted to the jury the question whether the failure

of the company to maintain gates, flagman, or flash signal at the crossing constituted negligence which was the proximate or one of the proximate causes of the accident. The submission of that question was challenged on the ground that there was no substantial evidence showing that the crossing was an unusually hazardous one which reasonably required the maintenance of any of such protective facilities.

In holding that the question whether such protective facilities should be provided was one for the jury, the court said:

"* * * No statute of Wyoming has been called to our attention which requires a railroad company to provide a crossing of this kind with any special warning, and there is no general duty at common law to maintain any particular facilities of that kind at a crossing. But the rights of the general public and the rights of the railway company at street crossings are mutual and reciprocal; and, although common convenience gives to trains precedence over automobiles in the use of crossings, it is upon the condition that the company will give due warning of the approach of its trains in order that those in automobiles may stop safely and wait for the trains to pass. What constitutes reasonable and timely warning depends upon the circumstances and surroundings. For instance, the vigilance and care must be greater at crossings in a populous city or town where the travel is great than at ordinary crossings in the country. And, as a general rule, whether reasonable care and prudence require under all the circumstances that special warning facilities be maintained at a crossing in a city or town is a question of fact for the jury. [Citing numerous cases.]"

■ The evidence does not show the amount of travel over this crossing at the time the accident occurred.

But, even if it were extremely light, that fact, in itself, would not remove the crossing from the category of unusually hazardous crossings. *Case v. Northern Pacific Terminal Co.*, supra; *Northern Pacific Railway Co. v. Moe*, 13 F. (2d) 377.

In the determination of this feature of the case we have not overlooked *Robison v. Oregon-Wash. R. & N. Co.*, 90 Or. 490, 176 P. 594; *Hornschuch v. Southern Pacific Co.*, 101 Or. 280, 203 P. 886; *Meaney v. Portland Electric Power Co.*, 131 Or. 140, 282 P. 113; *Irwin v. Southern Pacific Co.*, 163 Or. 72, 95 P. (2d) 62, cited by the defendant in support of its contention that the crossing here involved was not unusually hazardous. The factual situation in each of those cases is materially different from that in the instant case, and what is here said is not in conflict with the holdings in those cases.

■ We shall now consider defendant's second proposition of law, to wit, whether plaintiff was guilty of contributory negligence as a matter of law. In discussing this question we should not overlook the well established rule of law in this state that contributory negligence is an affirmative defense which must be pleaded and proved by the defendant, "except perhaps in those rare instances where it conclusively appears from the testimony adduced by plaintiff". *Flatman v. Lulay Bros. Lbr. Co.*, 175 Or. 495, 499, 154 P. (2d) 535. In the absence of evidence on the subject the presumption is that plaintiff exercised due care in crossing defendant's tracks. Negligence is never presumed. Proof that she was not negligent was no part of plaintiff's case. *McBride v. N. P. R. R. Co.*, 19 Or. 64, 23 P. 814; *Fuller v. Oregon-Wash. R. & N. Co.*, 93 Or. 160, 181 P. 338, 991; *Kirby v. Southern Pacific Co.*, 108 Or. 290, 216

P. 735; *Simpson v. Hillman,* 163 Or. 357, 97 P. (2d) 527. In *McBride v. N. P. R. R. Co.,* supra, the court said:

"* * * Where there is no direct evidence that a traveler did not stop, look and listen, the presumption of law is that he performed his full duty, or that he was not contributorily negligent. 'The common law presumption is,' said Clark, J., 'that every one does his duty until the contrary is proved, and in the absence of all evidence upon the subject, the presumption is that the decedent observed the precautions which the law prescribed.'

* * * * *

"While it is the duty of a traveler on the road when about crossing a railroad track, to observe the proper care and diligence by looking and listening, or both, as the necessity of the situation may require, for his safety, yet where the evidence is silent as to what the party injured in fact did on the occasion, it is not to be presumed that he recklessly exposed his own life, or attempted to cross the track in the face of an approaching train. * * *"

■■■ In the instant case plaintiff testified that she stopped at the regular railroad crossarm stop signal, but she was not asked whether she looked or listened when she stopped. As she proceeded to cross the track she observed on her right "nothing but boxcars", and on her left a switch engine "puffing and working" with smoke and steam coming from it. As she approached the scale track she looked both ways and as she passed that track she looked to her left to see what the switch engine was going to do and "glanced the other way and there was nothing coming that I could see, and I didn't hear anything." She did not hear "any whistle or other noise" as she approached the main line track. She first observed the train which struck her automobile when "it was right on top of me".

Defendant asserts that plaintiff "did not listen for a train. The last time she looked to her right, or west, was when she was 27½ feet distant from the main line track." Because of such alleged failure on the part of plaintiff to look and listen, defendant argues that she was guilty of contributory negligence as a matter of law. The burden of proving that plaintiff did not listen was on the defendant; it was a part of its defense. It was not incumbent on plaintiff to prove that she did listen. Moreover, the jury might at least have inferred that she was listening, from her testimony that as she passed the scale track she glanced to her right "and there was nothing coming that I could see, and I didn't hear anything." There is also the presumption that she did her duty.

The assertion by defendant, that the last time plaintiff looked to her right was when she was 27½ feet distant from the main line track, is difficult to understand. Apparently defendant arrived at the figure of 27½ feet by computing the distance between the south rail of the scale track and the north rail of the main line track. Plaintiff, as has hereinbefore been pointed out, testified that as she approached the scale track she looked both ways and that as she passed the scale track she looked to her left, to see what the switch engine was going to do, and glanced to her right. Since plaintiff apparently looked to her left before glancing to her right, she might have been several feet south of the scale track when she looked to her right. However, it is not contended by defendant that plaintiff could have seen the approaching train until she was within approximately 15 feet of the main line track.

Defendant called as a witness William H. Kennedy, a civil engineer employed by the Southern Pacific Company. Mr. Kennedy testified as to the distance between

the passing track and the scale track. He also testified that the "overhang of the standard boxcar" is close to two and one-half feet, and that, assuming the existence of a boxcar on the passing track 24 feet from the west curb line of Sixth Street and making allowance for the overhang of a boxcar, an observer on the curb line, six feet from the north rail of the main line track, "could look right straight down there [the main line track]"; that the view would be approximately the same "until you got up to a little more than 11 feet from the north rail"; that at a point 12 feet north of the northernmost rail an observer would have a clear view of about 105 feet west on the main line track; and that at a point 15 feet north, an observer would have a view of about 90 feet. There is no evidence as to what the view would be at a greater distance than 15 feet from the north rail.

The foregoing questions were based upon the hypothesis that the boxcars on the passing track were 24 feet west of Sixth Street, whereas the plaintiff testified that they were not more than 20 feet. Mr. Swacker, whose testimony we have hereinbefore referred to, stated that they were very close to the sidewalk, and that "I didn't have time; I wasn't thinking about the cars, but I wouldn't think that was over eight or ten feet, guessing." Asked whether he would testify that they were 8 or 10 feet, he answered: "I wouldn't want to swear to it, because I don't know how close they was. They were close; I will say that; they were close to the sidewalk." And on cross-examination he said: "They were awfully close, but I am not going to guess * * * ."

The evidence is undisputed that as she approached the railroad tracks plaintiff stopped at the regular rail-

road crossarm stop signal, which was approximately 130 feet north of the north rail of the main line track, and that she proceeded to cross the tracks at a speed of not over eight miles an hour. If we assume that she traveled at the rate of eight miles per hour, she would then be traveling at the rate of approximately 11.73 feet per second, and it would take her a little over eleven seconds to travel the distance from the stop signal to the main line track.

Mr. Kennedy testified that the overhang of passenger cars and locomotives is about the same as that of boxcars, i. e., approximately two and one-half feet. Defendant does not expressly state that it was the duty of plaintiff to have stopped immediately before crossing the main line track to ascertain whether there was a train approaching from her right, but we infer from its argument and the cases it cites that such is its contention unless plaintiff could have seen the train, while traveling in her automobile, in time to have avoided the collision.

Defendant relies to a great extent on *Cathcart v. Oregon-Wash. R. & N. Co.,* 86 Or. 250, 168 P. 308, and *Robison v. Oregon-Wash. R. & N. Co.,* supra. In the Cathcart case the accident occurred in the city limits of The Dalles where six tracks crossed Madison Street at right angles. A work train was standing on what is known as the eastbound main line. Its engine was headed east and extended eight or ten feet into Madison Street. Plaintiff testified that he passed about 18 feet in front of the standing locomotive and saw the approaching train on the next track too late to avoid the accident. He recovered judgment in the Circuit Court, and this Court, in reversing that judgment and ordering a nonsuit in favor of defendant, said: ''In

the present instance there must have been clearance between the two main tracks else the trains could not have passed each other; hence, there was a place, to wit, in this clearance, from which the plaintiff safely could have viewed the track before going upon it."

In the Robison case the accident occurred in the country. Frank Weygandt was driving and Robison was a passenger in the car. In the holding that Weygandt was, as a matter of law, guilty of contributory negligence, the court said:

> "* * * As applied to Weygandt, the testimony on his behalf, in the light most favorable for his administrator, shows that while yet his car was three or four feet from the track the locomotive could be seen at a distance of from eighty to one hundred feet. Even that space would have been clearance sufficient to prevent collision. The locomotive, passing so near, would not have frightened or disturbed his machine as if it had been a spirited team he was driving. We are not deciding within how short a distance an automobile can be brought to a standstill from any given speed. We are only saying that with his car halted three or four feet out of the way of the locomotive a chauffeur safely may look at a train moving on the track before him. * * * * "

The excerpts from the last two mentioned cases illustrate the extreme to which this Court has gone in the past to prevent recovery for injuries suffered at railroad crossings.

We shall next consider the case of *Pokora v. Wabash Ry. Co.*, 292 U. S. 98, 78 L. Ed. 1149, 54 S. Ct. 580, 91 A. L. R. 1049. Attention is there directed to a statement in *Baltimore & Ohio R. Co. v. Goodman*, 275 U. S. 66, 72 L. Ed. 167, 48 S. Ct. 24, 56 A. L. R.

645, reading as follows: "In such circumstances it seems to us that if a driver cannot be sure otherwise whether a train is dangerously near he must stop and get out of his vehicle, although obviously he will not often be required to do more than to stop and look." This was termed by the Court in the Pokora case as an unnecessary remark upon the facts before the Court. The Court then proceeded as follows:

"There is need at this stage to clear the ground of brushwood that may obscure the point at issue. We do not now inquire into the existence of a duty to stop, disconnected from a duty to get out and reconnoitre. The inquiry, if pursued, would lead us into the thickets of conflicting judgments. Some courts apply what is often spoken of as the Pennsylvania rule, and impose an unyielding duty to stop, as well as to look and listen, no matter how clear the crossing or the tracks on either side. [Here the court cites 2 cases from Pennsylvania, one from Alabama, and one from Maryland.] Other courts, the majority, adopt the rule that the traveler must look and listen, but that the existence of a duty to stop depends upon the circumstances, and hence generally, even if not invariably, upon the judgment of the jury. [Here are cases cited from New York, Iowa, Arkansas, Connecticut, and Illinois.] The subject has been less considered in this court, but in none of its opinions is there a suggestion that at any and every crossing the duty to stop is absolute, irrespective of the danger."

The Court, after discussing further the Goodman case, said:

"Choice between these diversities of doctrine is unnecessary for the decision of the case at hand. Here the fact is not disputed that the plaintiff did stop before he started to cross the tracks. If we assume that by reason of the box cars, there was a duty to stop again when the obstructions had been

cleared, that duty did not arise unless a stop could be made safely after the point of clearance had been reached. * * * For reasons already stated, the testimony permits the inference that the truck was in the zone of danger by the time the field of vision was enlarged. No stop would then have helped the plaintiff if he remained seated on his truck, or so the triers of the facts might find. His case was for the jury unless as a matter of law he was subject to a duty to get out of the vehicle before it crossed the switch, walk forward to the front, and then, afoot, survey the scene. * * *"

What the Court then said is very appropriate in considering railroad crossing accidents. We quote:

"Standards of prudent conduct are declared at times by courts, but they are taken over from the facts of life. To get out of a vehicle and reconnoitre is an uncommon precaution, as everyday experience informs us. Besides being uncommon, it is very likely to be futile, and sometimes even dangerous. * * *".

The Court then points out the different dangers which might be encountered by leaving the car parked and reconnoitring. It then says:

"* * * Where was Pokora to leave his truck after getting out to reconnoitre? If he was to leave it on the switch, there was the possibility that the box cars would be shunted down upon him before he could regain his seat. The defendant did not show whether there was a locomotive at the forward end, or whether the cars were so few that a locomotive could be seen. * * *"

The opinion closes with the following:

"Illustrations such as these bear witness to the need for caution in framing standards of behavior that amount to rules of law. The need is the more urgent when there is no background of experience

out of which the standards have emerged. They are then, not the natural flowerings of behavior in its customary forms, but rules artificially developed, and imposed from without. Extraordinary situations may not wisely or fairly be subjected to tests or regulations that are fitting for the common-place or normal. In default of the guide of customary conduct, what is suitable for the traveler caught in a mesh where the ordinary safeguards fail him is for the judgment of a jury. [Citing cases.] * * *"

In *Fish v. Southern Pacific Company*, supra, this Court stated that each railroad crossing case must be considered in the light of its own particular facts, "and, under the facts in this case, there is no fixed standard of conduct, failure to comply with which would, as a matter of law, prevent the plaintiff from recovery of damages. Conceding that the jury might have found that the obstructed view of the track and other circumstances which we have discussed created a situation of unusual danger, and had the effect of requiring the plaintiff, in the exercise of due care for his own safety, to observe more than ordinary precautions, it is apparent that reasonable men might draw different inferences and arrive at different opinions from the evidence as to whether or not due care had been exercised." It was there held that the question of plaintiff's contributory negligence was for the jury and not for the court.

The question for determination in the instant case is whether plaintiff exercised the care which a reasonably cautious person would have used under the circumstances. Obviously, the care which a traveler upon a highway is required to exercise in approaching and crossing railroad tracks is not such care as would, under all the circumstances, prevent injury.

Many questions present themselves for consideration in determining whether Mrs. Doty was guilty of contributory negligence. Some of them are: Was the speed at which Mrs. Doty was driving too fast? If so, at what speed should she have driven her car? Should she have stopped the car before proceeding across the main line track? If so, where should she have stopped? Was there a zone of safety where she could have stopped after the point of clearance had been reached? Should she have stopped on the passing track, on the scale track, or partly on each? Should she, before reaching the scale track, have stopped her car, got out and reconnoitred? As Mrs. Doty proceeded across the tracks, at what point could she have first seen the approaching train? Should she have seen it at that point? If she did not see it at that point, was she negligent as a matter of law? Should she have looked continuously to her right as she approached the main line track? If so, from what point should she have begun to so look? Would the presence of the switch engine to her left affect her duty to look to her right? Had she seen the approaching train, could she have stopped her car in time to avoid a collision?

■ Unless we can say, as a matter of law, that Mrs. Doty's failure to have seen or heard the train in time to have avoided a collision "was negligence so obvious and certain that one conclusion and one only is permissible for rational and candid minds", the question whether she was guilty of contributory negligence was for the judgment of the jury. *Pokora v. Wabash Ry. Co.*, supra; *Krause v. Southern Pacific Co.*, 135 Or. 310, 316, 295 P. 966; *Fish v. Southern Pacific Co.*, supra.

■ *Grand Trunk Ry. Co. v. Ives*, 144 U. S. 408, 417, 36 L. Ed. 485, 12 S. Ct. 679, clearly states under

what circumstances a case should be submitted to a jury. The court said:

"* * * There is no fixed standard in the law by which a court is enabled to arbitrarily say in every case what conduct shall be considered reasonable and prudent, and what shall constitute ordinary care, under any and all circumstances. The terms 'ordinary care,' 'reasonable prudence,' and such like terms, as applied to the conduct and affairs of men, have a relative significance, and cannot be arbitrarily defined. What may be deemed ordinary care in one case, may, under different surroundings and circumstances, be gross negligence. The policy of the law has relegated the determination of such questions to the jury, under proper instructions from the court. *It is their province to note the special circumstances and surroundings of each particular case, and then say whether the conduct of the parties in that case was such as would be expected of reasonable, prudent men, under a similar state of affairs.* When a given state of facts is such that reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury. It is only where the facts are such that all reasonable men must draw the same conclusion from them, that the question of negligence is ever considered as one of law for the court. [Citing numerous cases.]" (Italics supplied.)

A railroad crossing is an inherently dangerous place, and a traveler is bound to exercise care commensurate with the known hazards, and what is required depends upon the circumstances of each case. Courts are not at liberty to state, as a matter of law, that one must conduct himself in a particular manner in each case and under all conditions.

There was insufficient space between the main line and passing tracks in which plaintiff could have

safely stopped. The distance between the nearest rails was thirteen feet and seven inches. The overhang of cars on the two tracks would be approximately five feet, leaving a safety zone not exceeding eight feet and seven inches in width. We cannot say, as a matter of law, that she should have stopped on the passing track where "there was the possibility that the box cars would be shunted down upon" her. In this connection it must be remembered that defendant admitted that one of its switch engines was standing on the passing track west of Sixth Street, and there is other evidence that there was one or more boxcars between the engine and the street, and close to the sidewalk.

There is a distance of only eight feet and four inches between the passing and the scale tracks and therefore insufficient space in which Mrs. Doty could have stopped her car. There is evidence that there was no locomotive attached to the boxcars standing on the scale track, but there is no evidence that the cars on the scale track were so few that a locomotive attached thereto could be seen by plaintiff.

■ Mr. Wood, the fireman, testified that he "was sitting about eighty feet back from the highway" when he saw Mrs. Doty. He imagined that she was about 30 feet north of the main line track when he saw her. As soon as he saw that she was not going to stop he told the engineer "to hold it" and the engineer immediately applied the emergency brakes. The engineer stated that the cab of the engine was approximately 50 feet from the front of the engine and that he did not get the call from the fireman until "the front of the engine started on the sidewalk." In view of other evidence, inconsistent with Mr. Wood's testimony, it was for the jury, not the court, to resolve this conflict.

■ We cannot say, as a matter of law, that plaintiff, before reaching the scale track, or at any other place, should have stopped her car, got out and reconnoitred. See *Pokora v. Wabash Ry. Co.*, supra; *Fish v. Southern Pacific Co.*, supra. Nor can we say, as a matter of law, that the speed at which she was driving was excessive, or that she should have heard the whistle or bell.

We are of the opinion that it was for the jury, and not for the court, to determine whether the conduct of plaintiff "was such as would be expected of reasonable, prudent men, under a similar state of affairs", and that the Court did not err in denying defendant's motion for a directed verdict.

The judgment appealed from is affirmed.

LUSK, C. J., concurs in the result.

BELT, J., did not participate in this decision.

BRAND, J., dissenting.

I concur in the conclusion of the majority that there was substantial evidence that the defendant negligently created an extra hazardous crossing by reason of the manner in which the boxcars were parked adjacent to the highway. I dissent from the conclusion of the majority that the plaintiff was not guilty of contributory negligence as a matter of law.

The opinion in this case marks the final stage in the judicial erosion of the specific rules of law which have long been recognized as controlling the conduct of persons crossing railroad tracks. The majority opinion states that "The question for determination in the instant case is whether plaintiff exercised the care which a reasonably cautious person would have used under the circumstances." The majority quotes from *Grand Trunk Ry. Co. v. Ives,* 144 U. S. 408, 36

L. Ed. 485, as follows: "* * * There is no fixed standard in the law by which a court is enabled to arbitrarily say in every case what conduct shall be considered reasonable and prudent * * * ". That statement was written in approving an instruction which applied the general standard of reasonable care to both the plaintiff and the defendant. When the trial court instructed the jury specifically concerning the duty of the plaintiff it said: "* * * He should use all his faculties of seeing and hearing; he should approach cautiously and carefully, should look and listen * * * ", and the United States Supreme Court commented, "These instructions are so full and complete, and are in such entire accord with the rules of law applicable to cases of this character, that no fault whatever can be found with them. * * * " I agree that it is proper in railroad crossing cases to instruct as to the general duty to use care and prudence whenever a jury question is presented by the evidence, but in this kind of a case it is also the duty of the court to apply the rules which have defined and made specific the duty of due care.

In *Hecker v. Oregon Railroad Company,* 40 Or. 6, 66 P. 270, the court said:

"* * * He is required to exercise due and ordinary care to avoid being injured by a passing train. Formerly, the question of what was such ordinary care went to the jury. The law now, however, has gone beyond this, and requires a traveler about to cross a railway track to look and listen for an approaching train, and a failure in that respect, without reasonable excuse, is considered negligence as a matter of law * * * ".

The rule set forth in the Hecker case has been the law of Oregon at least since 1888. *Durbin v. Oregon*

*Railroad & Navigation Co.,* 17 Or. 5; *McBride v. Northern Pacific Railroad Co.,* 19 Or. 64, 23 P. 814. See also *Gomulkiewicz v. S., P. & S. Ry. Co.,* 131 Or. 175, 281 P. 851; *Long v. Pacific Ry. & Nav. Co.,* 74 Or. 502, 144 P. 462, 145 P. 1068. If these cases, and those which I shall later cite, are to be overruled, they should receive an official coup de grace' and not be left to languish from neglect.

I am of the opinion that the plaintiff was guilty of contributory negligence as a matter of law. In this case she merely testified that she did not hear anything as she approached the main track. There is no testimony that the plaintiff listened. To listen is "to give close attention with the purpose of hearing", (Webster's International Dictionary, Second Edition, Unabridged) and that is the measure of the duty imposed by law. The distinction is a vital one in the light of our decisions.

In the Hecker case it is held that a traveler is required to "look and listen at the time and place necessary in the exercise of ordinary care" and that this is generally a question for the jury, but surely this statement is not to be construed as meaning that a jury question is ordinarily presented if the traveler does not look or listen at all. See *Blackburn v. Southern Pacific Company,* 34 Or. 215, 55 P. 225. The Blackburn case teaches that the duty to listen is emphasized when the traveler is familiar with the crossing, and particularly when the view is obstructed.

> "His view of an approaching train from the south was completely obstructed, and on the north substantially so. It is obvious, from the entire surroundings, that he could not safely depend upon his eyes to ascertain whether a train was approaching from either direction. It was, therefore, in-

cumbent upon him to listen, and listen attentively * * *''. Blackburn v. Southern Pacific Company, supra.

In *Hecker v. Oregon Railroad Company,* supra, the Blackburn case was distinguished because the plaintiff was not, in the Hecker case, compelled to rely alone upon hearing. In *Conn v. Oregon Electric Ry. Co.,* 137 Or. 75, 300 P. 342, an exception to the rule of "Stop, Look and Listen" is recognized, but that exception applies when the existence of a track or railroad crossing is not apparent and is unknown to the traveler. The exception as recognized, was not applied where the view up or down the track is obstructed, but only where the existence of the railroad crossing is concealed. The distinction is recognized in *Andersen v. Southern Pacific Company,* 165 Or. 368, 106 P. (2d) 1048. In *Conn v. Oregon Electric Ry. Co.,* supra, the court applied the following rule:

"All the authorities support the proposition that where the evidence conclusively shows that a person injured at a railroad crossing must have seen or heard the approaching train if looking or listening, his testimony that he looked and listened and did not see or hear it is of no probative force and will be disregarded, even where such testimony is corroborated. * * * Such testimony is incredible as matter of law. In order to have this effect, however, the evidence must be conclusive."

The case has been modified to this extent only; that if the evidence shows that the plaintiff *listened* and did not hear, probative force may be given to the testimony. In *Andersen v. Southern Pacific Company,* supra, the testimony in behalf of the plaintiff showed that the driver of the car in which plaintiff was a guest stopped 26 feet from the track and the plaintiff

and three other persons therein looked and listened
and none of them saw or heard the approach of the
train. The court found that after proceeding from
the point at which the stop had been made, "the track
in the direction from which the train was approaching
was visible for a considerable distance, but that none
of the occupants of the car either looked or listened."

The court said:

"All plaintiff's witnesses testified that they did
not see the train, or hear the ringing of the bell or
the sound of the whistle, but no witness testified that
the headlight on the train was not burning, or that
the whistle was not blown or that the bell was not
rung before and at the time the train crossed
Jefferson street."

Concerning this case we find the following com-
ment in *Fish v. Southern Pacific Company,* 173 Or.
294, 143 P. (2d) 917, 145 P. (2d) 991:

"The court held, in effect, that testimony of
the occupants of the automobile, that they did not
hear the ringing of the bell or the blowing of the
whistle, was not evidence that the bell was not rung,
or that the whistle was not blown. The holding,
we think, was correct, in view of the fact that the
evidence was that none of the occupants of the car
either looked or listened. The fact that they failed
to listen distinguishes the case from the case at
bar."

In the case at bar there is no evidence that the plain-
tiff ever directed her attention for the purpose of
hearing, and it may be added that there is no evidence
that the plaintiff looked to her right after she crossed
the scale track, which is at least 27 feet from the main
line track, until she was on the main line track. The
analogy to the Andersen case is striking. Since there

is no evidence that the plaintiff listened for any approaching train, I conclude, in view of the quoted statement of this court in the Fish case, that plaintiff's testimony that she did not hear bell or whistle is no evidence that they were not sounded. This leaves only the strong and direct evidence that the bell was rung, the whistle blown, and that the engineer promptly applied the emergency brake upon notice of the plaintiff's danger. The evidence of the conduct of the engineer is in legal effect undisputed. It must be for this reason that the trial court granted a nonsuit in favor of the defendant engineer. If the defendant company is to be held liable for failure to reduce speed after notice that a collision was imminent, it must be upon the doctrine of respondeat superior, and by reason of the failure of the engineer to cause the whistle to be blown, the bell to be rung or speed to be reduced. The trial court granted an involuntary nonsuit as to the engineer and conductor, which amounted in law to a holding that there was no evidence of negligence on their part. That ruling became the law of the case from which no appeal has been taken. It follows that the defendant company cannot be held liable by reason of any alleged negligence on the part of the individual defendants and it also follows as the law of the case that there is no evidence of failure to ring the bell or blow the whistle or reduce speed. In *Fish v. Southern Pacific Company*, supra, this court said:

"The defendant O. O. Johnson, the conductor of the train, having been exonerated by the verdict of the jury, the appellant contends that such exoneration had the effect of depriving of any legal basis the verdict which was rendered against it. In this connection, it cites Feazle v. Industrial Hospital

Assn., 164 Or. 630, 103 P. (2d) 300; Emmons v. Southern Pacific Co., 97 Or. 263, 191 P. 333; Doremus v. Root, 23 Wash. 710, 63 P. 572, 54 L. R. A. 649; 2 Am. Jur., Agency, section 455, p. 361. The rule is that, where a master and servant are joined as defendants in an action to recover damages for a tort committed by the servant, a verdict in favor of the servant exonerates the master where the liability of the master, under the doctrine of respondeat superior, is based solely upon the wrongful act of the servant. The complaint in this case charged the defendants jointly with certain acts of alleged negligence. If the defendant Johnson had been the person who alone performed any of those acts, then a verdict in his favor would have exonerated the appellant, his employer. * * *"

To the same effect see *Feazle v. Industrial Hospital Association,* 164 Or. 630, 103 P. (2d) 300; *Bowles v. Creason,* 159 Or. 129, 78 P. (2d) 324; *Dare v. Boss et al.,* 111 Or. 190, 224 P. 646. Two cases have been thought to be contrary to this doctrine, but are not so. The case of *Hise v. City of North Bend et al.,* 138 Or. 150, 6 P. (2d) 30, is distinguished in the Feazle case, supra. *Doremus v. Root,* 23 Wn. 710, 63 P. 572, 54 L. R. A. 649, is cited and approved but distinguished in *Emmons v. Southern Pacific Co.,* 97 Or. 263, 296, 191 P. 333. The case of *Nickson v. Oregon-American Lumber Co.,* 127 Or. 326, 266 P. 254, 271 P. 986, is not inconsistent with the doctrine stated in the Fish case. In that case there were two servants of the defendant company. One was held not liable, but there was evidence of negligence by the other, on the basis of which the company could be held liable under the rule of respondeat superior.

The rule cited in the Fish case does not relieve the defendant in the case at bar from all charges of negli-

gence because there is evidence concerning the obstruction of the view at the crossing sufficient to carry the case to the jury on the issue of the defendant company's negligence without regard to the conduct of the engineer or to the doctrine of respondeat superior. The fact remains, however, that both the uncontradicted evidence and the ruling of the court leave the plaintiff in the position of one who, had she listened, would have heard both bell and whistle. It will even be recalled that plaintiff testified that she heard the bell at the moment of impact. From the majority opinion I quote the following:

"Unless we can say, as a matter of law, that Mrs. Doty's failure to have seen or heard the train in time to have avoided a collision 'was negligence so obvious and certain that one conclusion and one only is permissible for rational and candid minds', the question whether she was guilty of contributory negligence was for the judgment of the jury. * * *"

I agree as to "Mrs. Doty's failure to have seen or heard the train" and that the question at issue is what "we can say, as a matter of law". What Mrs. Doty could see is a matter of minor importance in this case, for, as we have held, the duty to listen is emphasized when the view is obstructed. If Mrs. Doty was guilty of "failure to have * * * heard" the raucous sounds of bell and whistle which were certainly audible to anyone who listened, then she violated the look and listen rule which has been, until now, the law of Oregon. The question is not whether the plaintiff failed to exercise reasonable care as that term is understood by a jury, but rather whether she failed to do the specific things which under our decisions must be done in the exercise of reasonable care. In this case her failure to listen; her failure to hear what could have

been heard, was conclusively established, and there was no question for the jury. I apprehend that, when the evidence in this type of case is conflicting, trial courts will be in grave doubt as to whether juries should be instructed upon the legal duty to look and listen, or whether they should merely follow the language of the majority opinion and state to the jury that "the question * * * is whether plaintiff exercised the care which a reasonably cautious person would have used under the circumstances."

Much has been said as to whether there was a place of safety between the scale track and the main line. There is no reason to assume that plaintiff could only hear the warning sounds after she got into the narrow area between the scale and main tracks. There were ample places of safety before she reached the scale track, places from which she could have heard what the other witnesses heard, had she listened. There was, however, in my opinion, a place of safety near the main track. The physical conditions at and near the crossing are portrayed by a map drawn to scale, received in evidence and constituting, as stipulated by the parties, a "reasonably accurate map" of the scene of the accident. Between track No. 2 and track No. 1 there is a distance of more than 40 feet. If we are to assume that plaintiff would not have heard the bell or whistle until after crossing the scale track, the point from which she glanced to the right, there was still a distance of at least 27 feet from the south rail of the scale track to the north rail of the main line track. The distance from the south rail of the passing track to the north rail of the main line track was 13.4 feet. Allowing 5 feet in accordance with plaintiff's testimony, as the distance from her position in the automobile to the

front thereof, it would follow that when the plaintiff, seated in the driver's seat, was directly over the south rail of the passing track, there was still a distance of 8.4 feet from the front of her car to the north rail of the main line track, or a distance of 5.9 feet to the point which would be covered by the overhang of an engine on the main line track. The switch engine on the scale track was "parked and was not moving". There was no evidence of motion by any locomotive on the passing track near Sixth Street. I know of no reason for assuming that plaintiff could not have heard the approaching passenger train before crossing either the scale or the passing track, but I merely point out that there was still a point at which she could have stopped had she listened and heard at the point last mentioned. It should be added that from a position in the driver's seat directly over the south rail of the passing track, plaintiff certainly had a view to her right up the main line track for a distance of over 100 feet. The plaintiff testified as follows:

"Q What if anything was on the Passing Track?

"A Boxcars.

"Q How far was the Easterly end of the boxcars on the Passing Track—how far would you estimate them to be from the edge of Sixth Street?

"A From the street or the sidewalk?

"Q The street.

"A Not over two boxcars from it. I don't know how far that is. I don't know the length of a boxcar.

"MR. GEARIN: It is sixty feet, Mrs. Doty.

"A Then I would say I don't think it would be sixty feet, but I didn't know how long a box car is. I am confused as to feet, as to the length of boxcars.

"Q In view of that fact, how far do you think it was from the edge of the street?

"A I should say not over twenty."

At a later time plaintiff marked and initialed a point on the passing track representing the end of the boxcar nearest the street. This mark scales a distance of at least 12 feet from the west edge of the sidewalk or 24 feet from the curb line. Accepting testimony to the effect that she was driving within 2 feet of the curb line, and assuming that she was sitting in the driver's seat, it follows that as she passed over the south rail of the passing track there must have been a distance of from 28 to 30 feet between her and the east end of the boxcar. The engineer who prepared the plat which was stipulated as correct testified as follows.:

"Q Mr. Kennedy, from a point on the West side of Sixth Street, the West curb line, at a point six feet to the North of the Northernmost rail of the Mainline Track, what would be your view conditions to the West along the Mainline Track, assuming the existence of a boxcar of the Passing Track 24 feet from the West curb of Sixth Street?

"A Well, an observer on the curb line, six feet from the North rail of the Mainline Track, would be—that would leave 7.7 feet to the rail of the Passing Track, and the boxcar which projects approximately 2½ feet on this side Southerly from the South rail there would not obstruct the vision at all. You could look right straight down there.

"Q How would that view condition be at seven feet, Mr. Kennedy? From Northernmost rail of the Mainline Track along the West curb line?

"A Well, the view would be the same until you got up to a little more than eleven feet from the North rail."

The engineer further testified that at a point 12 feet north of the northernmost rail of the main line

track one would have a view, standing on the curb line, of about 105 feet along the main line track. It is apparent that the view along the track would have been considerably greater had the engineer's observation been taken from the point at which plaintiff sat in her automobile, which was 4 or 5 feet east of the curb line. The physical measurements on the ground therefore indicate not only that the plaintiff had a safe place to stop, but also that she could have stopped her automobile after reaching a point from which she could have seen as well as have heard the approaching train.

In connection with the issue of contributory negligence, it must also be remembered that the defendant company was operating on a fixed track and had the right-of-way and the preference in passing the point of intersection. *Robison v. Oregon-Wash. R. & N. Co.*, 90 Or. 490, 176 P. 594; *Olds v. Hines,* 95 Or. 580, 187 P. 586, 188 P. 716; *Emmons v. Southern Pacific Co.*, supra.

The plaintiff, at least by implication, argues that she should not be held guilty of negligence as a matter of law because there was a diverting influence which may have distracted her attention from the approaching passenger train. The diverting influence in this case would be the switch engine on the scale track to the east of the street and two or three boxcar lengths therefrom.

In *Russell v. Oregon R. & N. Co.,* 54 Or. 128, 102 P. 619, the action was to recover damages for the death of a thirteen year-old boy who drove upon the railroad track without stopping, looking or listening. The court said:

 " * * * He 'thought as a child and understood as a child,' and in an emergency he would act as a

child, and it would be a harsh rule that would hold him to the same strict accountability that would be required of a person of mature years. * * *"

The court also observed that there was:

" * * * a dam in the river at this point, the roaring of which rendered it difficult to hear and locate trains. A sawmill nearby also furnished an additional voice to the general chorus. There was testimony that at times, and under certain conditions, the echoes from the high walls of the canyon —through which the road passes—so reverberated the sounds of trains and whistles as to deceive travelers into the belief that trains coming from the west were coming from the opposite direction."

There was no such situation in the case at bar and it may reasonably be inferred from the opinion that had the injured person in the Russell case been of mature years the court would have held him guilty of contributory negligence as a matter of law.

In *Christensen v. Willamette Valley Railway Co.*, 139 Or. 666, 11 P. (2d) 1060, the plaintiff driver of an automobile ran into some empty logging cars which were attached on the rear end of the passenger coach. We quote from the opinion of the court:

" * * * If the defendant railway company was operating this mixed train—composed in part of five empty logging cars—with red and green lights on the rear end of the passenger coach, but without any lights on the logging cars to indicate the rear end of the train, it was engaged in a dangerous enterprise. Any person of ordinary prudence who observed the red and green lights on the rear end of the passenger coach might well conclude that such markers indicated the rear end of the train. Under the circumstances, this feature would tend to divert the attention from any impending danger

of colliding with the empty logging cars and would, in fact, constitute a trap and a snare to those who used this highway crossing. In other words, we think there is substantial evidence tending to show that the negligence of defendant tended to lull the plaintiff into a false sense of security: * * *''

The court added:

" * * * Had it not been for the diverting influence involved in this case, such as the red and green lights on the motor coach, the absence of lighted markers on the logging cars, and the gleam of the lights of an automobile approaching from the opposite side of the track, the plaintiff might have been able to avoid striking the train. Who knows? * * *''

This was not merely a case of a diverting influence. It was, as the court said, a trap caused by the negligence of the defendant.

In *Kirby v. Southern Pacific Co.*, 108 Or. 290, 216 P. 735, action was brought by the plaintiff as administrator for the decedent, an eighteen year-old boy who was killed in a collision with a Southern Pacific train running 30 miles per hour. Plaintiff was driving west on Fifth Street and the train was approaching from the south. At that time a warning bell was ringing one block north of Fifth Street, and there was a train on the side track two blocks north of the place of collision. Judgment went for the plaintiff and the defendant appealed. The court indulged the presumption that the deceased had exercised due care and had looked and listened. We quote:

" * * * The circumstances after that indicate that the ringing of the bell at the intersection of Fourth Street with the railroad, and the train near the depot attracted the attention of the decedent

and diverted his observation from the railroad at the south. From the testimony in the case, the jury could reasonably conclude that the train was running at a terrific rate of speed, and that the decedent was driving only twelve or fifteen miles per hour and exercised due care."

The facts of the Kirby case resemble the one at bar only in this, that the driver's attention was directed toward a bell and engine on one side of the street, but he was hit by a train approaching from the other side. A distinction is that in the Kirby case it was presumed that the deceased looked and listened, and in the case at bar the evidence fails to show that she listened or that she looked from a point from which she could see down the track. In the case at bar we have quoted the evidence which shows that the switch engine, two or three boxcar lengths from the street, was parked, but that it was puffing, and bothered the plaintiff, and that she could hear it. If it distracted her attention prior to crossing the scale track, there was certainly no reason for believing that it constituted a distracting influence after she had crossed the track on which she knew the switch engine to be standing. From the scale track on, there was no disturbing influence.

The rule which has received the approval of this court is as follows:

"The duty to look and listen before crossing a railway track which is imposed upon travelers upon a highway continues as long as the occasion for the exercise of such duty continues and if there is any point at which by looking and listening the person injured could have avoided the accident and he failed to do so, his contributory negligence defeats a recovery."

This rule was cited with approval in *Cathcart v. Oregon-Washington R. & N. Co.,* 86 Or. 250, 168 P. 308. In the Cathcart case the facts were as follows: Madison Street in the city of The Dalles, runs in a northerly and southerly direction and is intersected at right-angles by Front Street, on which there are six railroad tracks. Plaintiff was driving northerly on Madison Street toward said intersection. The first three tracks, counting from the south, are switch and passing tracks. The fourth and fifth are main tracks. A work train headed east was standing on track 4, the front of the engine being approximately on the west line of Madison Street. This train obstructed plaintiff's view of the fifth track to the west of Madison Street. The plaintiff testified:

> " * * * I got over the fourth track and started, kept on going across slowly and the switch-engine was approaching very rapidly up on the fifth track and hit me as I was going across. * * *"

Plaintiff was looking and listening. The court said:

> "No case has been produced and we opine none can be which excuses the traveler from both looking and listening as he approaches a crossing; and it is well settled that, especially where he is familiar with the situation he must use greater care as the danger is greater. It is also reasonable as well as established by authority that he must look from a place where he can see and listen from a place where he can hear and that this duty is imperative so long as there is any need of its exercise; in other words, until the danger no longer exists. * * *"

Again the court said:

> " * * * Warned of danger by his thorough familiarity with the surroundings, he passed the zone of safety without efficiently looking from there

upon the only place from which danger would come and went forward into the accident which happened. * * * ''

The substance of the decision on appeal was that though the plaintiff looked and listened, he did not look from a point from which he could see whether or not a train was approaching. He was held guilty of negligence as a matter of law.

In my opinion, the reasons for holding plaintiff in the case at bar to have been negligent as a matter of law are stronger than those which existed in the Cathcart case. The conclusion is that the plaintiff would have heard the bell and whistle of the train had she listened. There being no evidence that she listened, she is chargeable with the knowledge of what she would have discovered if she had performed her duty in that respect. The plain fact is that plaintiff followed another car across the tracks. The other barely escaped being hit. Plaintiff did not escape. When plaintiff was asked what she did when she first observed the train she said, "I stepped on the gas but it didn't do any good. * * * It was very, very close; yes; so close that I couldn't get across ahead of it." In fact, her car did get across though it was hit in transit. The case appears to be one in which plaintiff tried to beat the train, but the race ended in a tie.

We also find that there was a place of safety from which she could have looked without leaving her car and from which point she could have ascertained if the train was approaching, but there is no evidence that she looked after crossing the scale track. That she did not look is shown by the fact that she did not see what she could have seen had she looked. If the switch engine constituted a diverting influence, nevertheless

that influence ceased to be operative when she crossed the scale track.

The majority opinion demonstrates that a plaintiff is not always required to stop or to stop, get out and reconnoiter. I agree that it was not necessary to get out and reconnoiter, and that there is no general rule requiring the motorist to stop. I would assume, however, that under any rule, if looking or listening would have warned the plaintiff of the approach of the train, she would have a duty to stop rather than risk suicide. It has been suggested that in the case of *Fish v. Southern Pacific Company,* supra, this court abandoned the specific rules of law requiring one to look and listen and substituted the broad, general rule which leaves to the jury the question as to whether or not the plaintiff acted as a reasonably prudent person under the circumstances and consequently that the decision in that case requires the conclusion reached by the majority in this case. I do not so construe the decision in the Fish case. In that case it is repeatedly stated that the plaintiff was listening all of the time as he approached the point of collision. The whistle was blown, if at all, approximately a mile away, and whether the bell was rung was a jury question. In the Fish case the court cited *Andersen v. Southern Pacific Company,* supra, and as I have shown, expressed the view that the holding of that case was correct in view of the evidence that none of the occupants of the car looked or listened. Again in the Fish case the court quoted from the Cathcart case and distinguished it by pointing out that:

" * * * The only manner in which the plaintiff could have obtained a clear view of the railroad track, without placing himself in a position of im-

mediate danger, would have been to have stopped his car and gone forward on foot."

The court also cited and distinguished *Slusher v. Great Southern R. R. Co.,* 107 Or. 587, 213 P. 420. It is true that the court said:

> "The circumstances here seem to us to be such that reasonable men might draw different conclusions  *  *  * as to whether or not the plaintiff was guilty of contributory negligence in proceeding to cross over the tracks, relying upon his sense of hearing. These questions cannot be determined by this court as a matter of law  *  *  *"

But, in the Fish case, no question of failure to listen was involved. The whole question was whether, having listened, he had a further duty and opportunity to investigate by going forward on foot and looking. We find in the Fish case no disavowal of the rule that one has a duty to look for an approaching train from a place where he could see, and to listen from a place where he could hear. On the matter of listening, the court said in the Fish case:

> "  *  *  * As for his duty to listen from a place where he could hear, it is evident that, if his hearing was normal and if he was listening, he should have heard the locomotive bell tolling as he proceeded across the switch track, if the bell had been tolled."

The point of the case was that having listened all of the time, and not having heard the bell, the jury might infer that it was not rung. Here, no such inference is possible. Again, in the Fish case, the court cited *Robison v. Oregon-Washington R. & N. Co.,* 90 Or. 490, 176 P. 594, and said:

> "We have no intention of detracting from expressions in the opinions in the Cathcart and Robison cases, to the effect that the mere presence of

the railroad track is, in itself, a warning to the traveler who would cross it. * * *"

This is a far cry from any implication that those cases were overruled. The majority opinion quotes the following from the Fish case:

" * * * Each case, of course, must be considered in the light of its own particular facts, and, under the facts in this case, there is no fixed standard of conduct, failure to comply with which would, as a matter of law, prevent the plaintiff from recovery of damages. * * *"

This language may be explained by the fact that in the Fish case there was no place of safety from which to look and there was affirmative compliance with the duty to listen.

The majority opinion states that contributory negligence is an affirmative defense, and plausibly adds:

" * * * The burden of proving that plaintiff did not listen was on the defendant; it was a part of its defense. It was not incumbent on plaintiff to prove that she did listen. * * *"

The plaintiff did not hear any noise of the train, but if we are to follow our own decisions cited supra, her testimony to that effect is of no probative force and will be disregarded unless she listened and then did not hear. *Conn v. Oregon Electric Ry. Co.*, supra. If her testimony that she did not hear is disregarded, then the conclusive evidence that the bell was rung and the whistle blown satisfies the burden of proof and establishes that she should have heard what must have been plainly audible.

It is a familiar device employed by counsel in cases of this kind to argue that this court usurps the function

of the jury when it holds that a plaintiff who has recovered a verdict below is guilty of contributory negligence as a matter of law. Such argument is wholly unjustified in any case of this type. We do not weigh the evidence. We accept it in the light most favorable to the plaintiff even though her own witnesses contradicted her evidence in material respects. The question before us is one of law based on special rules relative to the duty of travelers in motor vehicles at railway intersections. These rules have been long established for the protection, not only of automobile travelers, but also for the safety of members of the general public who travel upon railroad trains. To treat this case as if the only interests involved are those of the plaintiff and the defendant corporation, seems to me to ignore the realities of the situation. The rules governing conduct at railroad crossings have evolved from the judicial consciousness that the safety of hundreds of persons innocently traveling on trains depends upon the maintenance and enforcement of special rules of law for the prevention of collisions. Any relaxation of the rules as here set forth would result in increasing the peril to travelers by both means of locomotion.

In conclusion, I venture to say that the jury system is suffering damage at the hands of its friends. At common law, and under the federal practice, a jury trial is one in which the jury is instructed as to the law and advised as to the facts by the judge who may comment upon the evidence. In Oregon, the legislature has prohibited the court from advising the jury as to the facts. At common law, and in Oregon, the trial court had power and a duty to set aside a verdict which was plainly excessive. The Oregon courts have been de-

prived of that power, and doubts are even expressed whether a new trial can be granted when the size of the verdict indicates passion or prejudice. In the case at bar this court now, by implication, overrules specific rules of law of long standing concerning the duty of travelers in crossing railroad tracks and leaves to a jury to say in broad, general terms whether the plaintiff exercised reasonable care, applying their own definition and not that of the law. The jury system is a priceless protection against arbitrary action by the judiciary. Juries are competent to determine facts, but are mere amateurs at applying the law to the facts. I deplore the modern tendency to solve all difficult questions by saying that they are for the jury to decide.